[File No. 7132]

WILLIAM A. STARK, on behalf of himself and all other Taxpayers similarly situated, Appellants, v. THE CITY OF JAMESTOWN, a Municipal Corporation; John F. Olson, as Mayor of the City of Jamestown; A. R. Thompson, as City Auditor of the City of Jamestown; Arthur Stuckenbruck, R. F. Boehm, C. W. Cockrell, Kenneth Hall, W. F. Sharp, J. J. Flannery, Otto Bettcher, Louis Havelick, A. F. Baenen, Lloyd Musberger, Edward Job, and A. A. Gaustad, as Members of the City Council and Governing Body of the City of Jamestown, Respondents.

(37 NW2d 516)

424

Opinion filed April 26, 1949.

*Robert E. Fredricks,* for appellants.
*Harry E. Rittgers,* for respondents.

CHRISTIANSON, J.   This action was brought by the plaintiff as a taxpayer in the City of Jamestown on behalf of himself and all other taxpayers similarly situated to enjoin the City of Jamestown and the mayor and members of the city council of said city from issuing and selling certain revenue bonds, which it is alleged the said defendants propose to issue and sell for the purpose of obtaining funds to make certain improvements in and to construct additions and extensions to water and sewer systems theretofore established in said city.   The court made findings of fact and conclusions of law favorable to the defendants and ordered judgment denying the relief sought and further ordered a dismissal of the action.   Judgment was entered accordingly and the plaintiff appeals from such judgment and demands a trial anew in this court.

The action is predicated upon the proposition that the issuance and sale of such revenue bonds would result in the defendant city incurring a debt in excess of the limitations prescribed by Section 183 of the Constitution of the State; and that the issuance and sale of such bonds are contrary to certain provisions of ND Rev Code 1943, Chapter 40–35, known as the Revenue Bond Law.   The issues presented in the case therefore involve the construction of certain provisions of the Revenue Bond Law (ND Rev Code 1943, Chapter 40–35) in connection with Section 183 of the Constitution of this state.

The City of Jamestown owns and operates a water system and also a sewer system. Both systems have been in existence and operation for a considerable period of time. In 1937 a filtration plant was constructed and put into operation as a part of the water system. The filtration plant was designed for the treatment of 1400 gallons of water per minute and at the present time during the summer months the filtration plant is being operated at not less than twice its normal capacity. Thus, it is shown that after July 1, 1946, some 259 new water services and meters had been installed, 91 of these had been installed after July 1, 1948. The settling tanks are too small to handle the increased volume of water and as a result lime is carried over into the filters causing them to become clogged and in turn requiring more frequent washing thereby increasing the amount of water used by the city, as about 120,000 gallons of water are used in each washing. That as a result of the use of the plant in excess of its capacity the hardness of water supplied to the users has been greatly increased and the quality of the water has been impaired. The present water storage facilities of the city consist of two tanks in the northern part of the city each having a total capacity of 130,000 gallons making a total maximum storage capacity of both tanks of 260,000 gallons. The present storage tanks are old, badly rusted and corroded. They have been repaired repeatedly at much expense to the city in an attempt to prolong their use and at the time of the institution of this action one of the tanks was leaking badly at the base and both of the tanks were in such condition that they might break down and become useless at any time. The principal growth of the city has been toward the south and during the summer months the water pressure has decreased to such an extent that water frequently flows from the faucets at a mere trickle. In order to equalize the pressure throughout the city and furnish necessary fire protection, it is necessary that further storage facilities be constructed south of the city. The minimum practical storage capacity in order to meet all probable needs is two million gallons.

The present sewage disposal plant of the city was designed in 1928 and constructed during 1928 and 1929. When the plant was

constructed some consideration was given to the future growth of the city but at the present time the plant is being used to its ultimate capacity and, in fact, the quantity of sewage is so large that the sewage is not being retained in the settling chambers for the period required for proper sedimentation. The present sludge chambers have a capacity of only about one-half the capacity prescribed by the present requirements of the State Health Department.

With this rather critical condition confronting them the city council employed a well known firm of engineers to examine the present water and sewer facilities and consider what steps must be taken to provide adequate water and sewer systems for the city. Such engineers submitted an extended report covering every conceivable phase of the matter and making specific recommendations as to the improvements that ought to be made in order to meet the needs of the city. Thereafter, the city council approved an improvement project involving expenditures of approximately one million dollars and decided to finance the entire cost of the improvement by revenue bonds to be paid solely out of the income from the water and sewer systems of the city. The city council caused to be submitted to the electors of the city the question whether the city council should be authorized to issue revenue bonds of the city in an aggregate amount not exceeding the physical value of the water and sewerage utility nor one million dollars. The proceeds of such bonds to be utilized to pay for the proposed improvement to the water and sewerage utility but that no payments on such bonds either for principal or interest should be made out of "tax levies or to constitute a debt or indebtedness of the city . . . but all thereof to be payable solely out of the net revenues to be produced by the operation of said utility." The result of the election was that 1260 votes were cast in favor of the proposed bond issue and 120 votes were cast against the proposal.

There is no dispute between the parties but that there is an actual necessity for the proposed improvement. The only dispute concerns the plan or method which the city council has adopted for financing the proposed improvement. In Plaintiff's brief on this appeal it is said: "We concede that the water

storage facilities of the City now are, and for many years have been wholly inadequate. We further concede that the Sewage Disposal Plant is or soon will be inadequate. We concede that the improvement and extension program is both necessary and desirable, and that the best interest of the City and the public would be served by making most of the improvements program just as soon as possible."

In connection with this concession plaintiff argues that it will not be necessary to abandon the proposed improvement if the plan adopted by the city council to finance such improvement by the proposed issue of revenue bonds is held to be unauthorized; that it will be possible for the city to finance the construction of the proposed improvement by general bond issues supplemented if necessary by special assessments. The plaintiff contends, however, that inasmuch as the city now owns the water and sewer systems and the income derived from the water system belongs to the city such income constitutes property of the city; and that inasmuch as under the plan adopted by the city council all income from the water and sewer systems, including both the present systems and the additions and extensions to be constructed, will be placed in a fund to be established and used for the payment of the revenue bonds, such bonds will constitute a general indebtedness of the city, and that the issuance and sale of such bonds is forbidden by Section 183 of the Constitution of the State.

It goes without saying that the fact that the city council might have financed the improvement in the manner suggested by the plaintiff did not limit it to such means and the city council was authorized to use any plan that was authorized by law. Lang v. Cavalier, 59 ND 75, 288 NW 819.

Do the revenue bonds which the defendants propose to issue fall within the provisions of, and are they subject to any of the limitations fixed by, Section 183 of the Constitution? We think not.

Section 183 reads: "The debt of any county, township, city, town, school district or any other political subdivision, shall never exceed five per centum upon the assessed value of the taxable property therein; provided that any incorporated city

may, by two-thirds vote, increase such indebtedness three per centum on such assessed value beyond said five per centum limit, and a school district, by a majority vote may increase such indebtedness five per cent on such assessed value beyond said five per centum limit; *provided also that any county or city by a majority vote may issue bonds upon any revenue producing utility owned by such county or city, or for the purchasing or acquiring the same or building or establishment thereof, in amounts not exceeding the physical value of such utility, industry or enterprise.*

"In estimating the indebtedness which a city, county, township, school district or any other political subdivision may incur, the entire amount, exclusive of the bonds upon said revenue producing utilities, whether contracted prior or subsequent to the adoption of this constitution, shall be included; provided further that any incorporated city may become indebted in any amount not exceeding four per centum of such assessed value without regard to the existing indebtedness of such city for the purpose of constructing or purchasing waterworks for furnishing a supply of water to the inhabitants of such city, or for the purpose of constructing sewers, and for no other purposes whatever. All bonds and obligations in excess of the amount of indebtedness permitted by this constitution, given by any city, county, township, town, school district, or any other political subdivision shall be void."

The provision in Section 183 which we have italicized was added by constitutional amendment, approved March 16, 1920. Article 35, Amendments to the Constitution; SL 1921, p 258. By this amendment the limitation on the indebtedness of counties and cities formerly prescribed was extended so as to permit "a county or city by a majority vote to issue bonds that may exceed the debt limit in an amount equaling the physical value of the utility, industry, or enterprise upon which such bonds may be issued." Anderson v. Fargo, 64 ND 178, 187, 250 NW 794, 797–798. For the sake of convenience we shall refer to the provision of Section 183 of the Constitution which we have italicized as the "utility bond clause."

In his brief plaintiff's counsel says: "All proceedings so

far taken state that they are under 40–35 and mention is continually made of 'revenue bonds' and 'pledge of net income.' " He argues that the Revenue Bond Law (ND Rev Code 1943, Chapter 40–35) was not enacted in "furtherance or pursuance of the utility bond clause of the Constitution;" and he asserts that the proceedings of the city council indicate a purpose and intention on their part to bring the bonds which they are about to issue within, and give to them the status and character of bonds issued under, the utility bond clause of Section 183 of the Constitution. He argues that bonds may be issued pursuant to the utility bond clause of said Section 183 only *"upon"* a "revenue producing utility owned by such county or city, or for the purchasing or acquiring the same or building and establishment thereof;" that the bonds sought to be issued here are not to be issued *upon* a revenue producing utility owned by the city or for the purchasing, acquiring, building or establishment of such utility; but that such bonds are to be issued and sold for the purpose of financing the repair and improvement of an existing water and sewer undertaking and are not to be secured by the properties of the undertaking but are to be secured only by a pledge of the net income of the undertaking. The principal basis for the contention that the city council intends to give to the bonds which it proposes to issue the status and character of bonds issued under the utility bond clause of Section 183 of the Constitution is that the city council caused the question whether the city council should be authorized to issue such revenue bonds to be submitted to the people at an election and also that in its proceedings the term "utility" is used in some places in referring to the water and sewerage undertaking which has been established by the city and from the earnings of which the revenue bonds are to be paid.

It is pointed out that if the bonds were to be issued under the Revenue Bond Law there was no need for submitting the question of their issuance to the people at an election; that under the Revenue Bond Law the city council had authority to issue such bonds without an election; and, it is said that the fact that the city council submitted the question whether the bonds should be issued to the people for approval or rejection at an election

evidences an intention on the part of the city council to give to the bonds the status and character of bonds issued under the utility bond clause of Section 183 of the Constitution. We find it unnecessary to enter into any discussion of the question whether the city might have issued bonds under the utility bond clause of Section 183 for the purpose of financing the construction of the proposed extensions and additions to the water and sewer facilities of the city, for we are entirely satisfied that the city council had no intention to issue any such bonds. It is true as plaintiff's counsel asserts that bonds issued under the provisions of the Revenue Bond Law do not fall within any of the provisions of Section 183 of the Constitution.

It is also true that the Revenue Bond Law does not require that bonds issued thereunder for the purposes for which the bonds in question here are to be issued be approved at an election, and that the city council has authority to issue such bonds without submitting the question of their issuance at an election. The record, however, leaves no doubt that the city council intended to issue revenue bonds under the provisions of ND Rev Code 1943, Chapter 40–35,—bonds to be payable solely out of the revenue derived from the operation of the water and sewerage undertaking of the city and secured only by a pledge of the net income from such revenue producing undertaking and that there was no intention on the part of the city council to issue bonds upon a revenue producing utility within the purview of Section 183 of the Constitution. So far as concerns the power of the city council to issue the proposed bonds the election was an idle ceremony. It did not add to nor detract from the authority conferred upon the city council. Obviously the council continued to have the power which had been conferred upon it by law, and the fact that the election was held and that the proposed issuance of bonds was approved by the electors did not in any manner detract from the legality or validity of the proceedings had or the actions taken by the city council under the law. In view of the large expenditure involved and the importance of the proposed improvement it is not altogether strange that the city council desired to obtain the views of the people before taking final action.

A significant development of the law of municipal corporations, in comparatively recent times, is the extensive use by municipalities of revenue derived and to be derived from the operation. of municipal enterprises or utilities as a means of financing the acquisition, construction, or improvement of such enterprises or utilities, and the issuance of obligations commonly known as revenue bonds payable solely from the earnings of the enterprise or utility acquired, constructed, or improved with proceeds from the sale of such revenue bonds. The issuance and use of such revenue bonds are usually predicated upon express statutory enactments although as will be noted presently the first case presented to this court relating to obligations of this character involved a situation where obligations payable solely from the earnings of an electric light plant were issued by a city pursuant to the general power conferred upon it by law to purchase, erect, manage, and maintain an electric light and power plant and to supply the same for municipal and commercial purposes and to pass all ordinances necessary for the maintenance, management, and control thereof. Lang v. Cavalier, 59 ND 75, 228 NW 819, decided January 15, 1930. The reports of the adjudicated cases disclose that the authority of a municipality to issue such bonds and the validity of the statutes authorizing the issuance thereof have frequently been drawn in question. The questions usually presented in these cases were whether such revenue bonds or obligations constituted an indebtedness of the municipality within the meaning of a constitutional limitation on the amount of indebtedness which the municipality might incur, or whether constitutional provisions requiring a bond issue to be approved at an election, or making mandatory the levy of a tax to pay interest and principal on bonds, applied to such revenue bonds.

Apparently the first decision of a court of last resort involving issuance of revenue bonds and sustaining an obligation of this character against an attack on the ground that it constituted a debt of the city within the constitutional provision fixing a debt limit was the decision of the Supreme Court of Washington in Winston v. Spokane, 12 Wash 524, 41 P 888, decided in 1895. In that case the City of Spokane entered into a contract

with certain parties to furnish money for the completion of a system of waterworks for the city, and such contract provided for the issuance to such persons for the money so furnished by them of obligations of the city payable solely out of a special fund to be created and maintained by placing therein 60 per cent of the receipts derived from the operation of such waterworks. The agreement was challenged on the ground that the obligations to be issued to the persons who advanced the money would constitute an indebtedness of the city within the meaning of the constitutional debt limit provision and that as a result the debt limit would be exceeded. The court held that the obligations to be issued and payable out of such special fund did not constitute a debt of the city within the constitutional limitation; that the general credit of the city was in no manner pledged; that there was no general liability on the part of the city, and that the only obligation was to pay the obligations out of monies in the special fund and not otherwise. The revenue bond plan thus adopted in the City of Spokane was afterwards adopted by other cities in the State of Washington and the rule announced in Winston v. Spokane, et al. was subsequently reaffirmed by the Supreme Court of Washington in many cases. Faulkner v. Seattle, 19 Wash 320, 53 P 365; Dean v. Walla Walla, 48 Wash 75, 92 P 895; Twitchell v. Seattle, 106 Wash 32, 179 P 127. The plan was later adopted in other states and in most of the states where the question arose the rule adopted by the Supreme Court of Washington was followed and approved. In some states, however, it was rejected, especially where there was an undertaking to establish and collect rates or tolls to cover payments to become due on the revenue bonds (38 Am Jur 154, § 473; Note: 72 ALR 692 et seq.); or where there was an undertaking on the part of the municipality to pay into the special fund the established rates for service rendered to the municipality by the enterprise or utility.

Some courts have drawn a distinction between revenue bonds issued for the construction of a new enterprise or utility and revenue bonds issued to finance additions or extensions to an existing enterprise or utility. 38 Am Jur 155–156, § 474; Note:

72 ALR 695, et seq.; Note: 96 ALR 393, et seq.; Note: 146 ALR 344, et seq.

American Jurisprudence says: "There is a conflict of authority, which is intensified by the diversity of conclusions reached in the later cases, as to whether an indebtedness within the meaning of organic limitations is incurred where property purchased by a municipality consists of machinery or improvements for a plant already owned by the municipality, and the revenue of both the existing plant and of the additions or improvements purchased is pledged or set aside for the payment of the purchase price of the latter. The probable weight of authority supports the view that such a transaction does not create a debt or liability where no mortgage or other lien is placed on the existing property of the municipality. Courts following this view are unable to find any distinction in principle between the application of the revenues derived from an old utility to the creation of a special fund and the application of those from a new utility for the same purpose so long as the income from the old or existing utility is free and unpledged to the payment of any other municipal obligation. . . .

"A number of courts have taken the view that the pledging of the income from the existing property of a municipality, and not merely that from the improvements or additions purchased, amounts to the creation of an indebtedness." 38 Am Jur 155–156, § 474.

It seems that the distinction between revenue bonds issued for the purchase or construction of a new enterprise or utility and revenue bonds issued to finance additions or extensions to an existing enterprise or utility owned by the municipality, and the theory that where extensions or additions are made to an existing plant owned by the municipality the pledging of the income from the entire plant including the property owned by the municipality and the improvements or additions thereto will operate to create an indebtedness within the purview of the constitutional limitation were first announced in Joliet v. Alexander, 194 Ill 457, 62 NE 861, decided February 21, 1902. The City of Joliet owned and operated a system of waterworks from

which it derived a net annual income of about $10,000. It became necessary to extend and enlarge the system, and to finance the proposed improvement the city provided for the issuance of water fund certificates and provided that the entire proceeds of the waterworks system should be paid into a water fund and that no money should be paid out of such fund except for the necessary operating expenses of the waterworks system and the payment of the certificates with interest until all were fully paid. It was further provided that the certificates should be secured by mortgage or deed of trust on the waterworks system and appurtenances then owned by the city and the extensions to be constructed under the ordinance. The Supreme Court of Illinois held that the giving of the mortgage on the old system to secure the payment of the certificates created an indebtedness of the city within the constitutional debt limit. The court, however, did not rest its decision on this ground alone. It went further and expressed the view that the income from the existing waterworks, over and above operating expenses, constituted property of the city and that if such income were pledged to pay the water fund certificates, such certificates would become an indebtedness of the city within the meaning of the constitutional debt limit provision. The views expressed in Joliet v. Alexander were reaffirmed and amplified in Schnell v. Rock Island, et al., 232 Ill 89, 83 NE 462, 14 LRA NS 874, decided December 17, 1907. In the decision in that case it was said:

"A city may acquire a system of waterworks by pledging the income until it shall pay for the system, and no indebtedness is created. The same rule might apply to some definite extension of waterworks where the income of the extension could be separated and applied to payment; but an obligation to pay with the income of property already owned by a city is not different from an obligation to pay with any other funds, so far as the question whether the transaction amounts to a debt is concerned." 232 Ill at p 99, 83 NE at p 464, 14 LRA NS at p 877.

The view thus expressed in Joliet v. Alexander and Schnell v. Rock Island, et al. apparently constituted the law in Illinois until the decision was rendered in Maffit v Decatur (1926) 322 Ill 82, 152 NE 602.

The City of Decatur owned a water system comprising a pumping station, filtration plant, water mains, and a dam in the Sangamon River by which water was stored for the city's use. It was found that it was necessary to construct a larger dam in order to impound sufficient waters to meet the growing needs of the city and that in order to put such dam to proper use it was necessary to acquire a considerable tract of land that would be inundated. The city, already indebted beyond the constitutional debt limit, entered into an agreement with a corporation whereby the latter would construct and maintain, at a large cost, the proposed reservoir, and that the water rents of the entire waterworks plant would be paid into a fund, of which 90 per cent was to be paid annually to the company which financed the acquisition of the land and the construction of the reservoir until there was full repayment, in which case the company's property would be conveyed to the city. Suit was brought by a taxpayer to enjoin the city from carrying out the agreement on the ground that if the agreement were carried out, the city would incur an indebtedness in excess of the constitutional debt limit. The court held that an indebtedness of the city was not created by this agreed method of paying the company and acquiring the addition to the plant out of the income from the entire plant, hence no obligation was imposed on the city to pay the company.

The question whether a city which owns and operates a utility and which makes improvements in and additions to the utility system will incur an indebtedness within the purview of the constitutional debt limitation by pledging the revenue from the entire system, including the improvements and additions, for repayment of monies furnished to defray the cost of constructing the improvements and additions was again considered by the Supreme Court of Illinois in Ward v. Chicago, et al. (1930) 342 Ill 167, 173 NE 813. In that case the ordinance of the city provided for issuance of certificates of indebtedness to pay for the enlargement of the city's waterworks under a statute authorizing it, and provided that the certificates were payable only from revenue derived from the waterworks. It provided that certificates be issued for $12,-

000,000, which should not constitute an indebtedness of the city within any constitutional limitation, and that thereupon the entire revenue received from the operation of the city's system of waterworks should be deposited in a separate fund, to be used only in paying operating expenses, obligations theretofore issued payable from such revenue, and the certificates issued under the ordinance. Suit was brought to enjoin the issuance of the certificates of indebtedness on the theory that the city would incur an indebtedness for the amount of the certificates issued and that the transaction if carried out would violate Section 12 of Article 9 of the Constitution of Illinois which provided that "no county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness." The court held that the proposed certificates of indebtedness would not create an indebtedness against the City of Chicago within the meaning of the constitutional provision invoked by the plaintiff. In the opinion in the case the court used the following significant language:

"The main reliance of appellant is upon the case of the City of Joliet v. Alexander, 194 Ill 457, 62 NE 861. . . . Counsel for appellant in the present case lay considerable stress upon certain language of the opinion to the effect that indebtedness within such constitutional prohibition may be created by pledging an existing income of the city, arguing that in the present case there can be no way of determining how much income would be attributable to the new rates to be put into effect; that the so-called new income cannot be segregated from the present income; that the present income will thereby be taken away and lost; and that so cutting off and pledging it will create an indebtedness within the meaning of the language invoked. The position thus taken seems to be that pledging the water fund creates indebtedness within the constitutional prohibition unless the pledge is confined to such precise income as can be di-

rectly traced to the particular new physical element of the plant to pay for which the obligation secured was issued, leaving the original income in effect intact and usable by the city for other purposes altogether. The Decatur case is decisive against the soundness of such a position. There the income from the original plant was in effect cut off and lumped into the fund resulting from the operation of the plant as enlarged. It is not apparent that any effort was there made to preserve such original income intact or exempt it in any manner or degree from the claim of the water company, or that moneys made available to the water company under the contract were at all limited to income traceable to the elements of the plant which it had financed." 342 Ill at pp 173–174, 173 NE at pp 812–813.

The doctrine announced in Maffit v. Decatur, 322 Ill 82, 152 NE 602, supra, and Ward v. City of Chicago, supra, was subsequently reaffirmed and applied by the Supreme Court of Illinois in Simpson v. Highwood (1939) 372 Ill 212, 23 NE2d 62, 124 ALR 1459; in Krause v. Peoria Housing Authority (1939) 370 Ill 356, 19 NE2d 193; and in Edwardsville v. Jenkins, 376 Ill 327, 33 NE2d 598, 134 ALR 891; and so far as we can ascertain is the law of Illinois today. In Jerseyville v. Connett (1931) 49 F2d 246, Judge Alschuler, speaking for the Circuit Court of Appeals of the 7th Circuit, said: "The Ward case is distinctly antagonistic to that part of the decision in the Joilet case where it is said that the pledging of the income from the old plant for the payment of water fund certificates issued for enlargement or extension constituted the certificates an indebtedness of the municipality within the constitutional provision." 49 F2d 249. The Supreme Court of Missouri in Grossman v. Public Water Supply District No. 1 (1936) 339 Mo 344, 96 SW2d 701, stated, "one cannot read these three Illinois cases (Schnell v. Rock Island, et al., supra; Maffit v. Decatur, supra; and Ward v. Chicago, supra) and reach any other conclusion than that the segregation doctrine of the Rock Island case is no longer the law in Illinois."

The question whether an obligation payable solely from the earnings of an enterprise or utility constitutes a debt within the meaning of the constitutional debt limitation was first

presented to this court in Lang v. Cavalier, supra. The City of Cavalier issued its general bonds in the sum of $16,000 pursuant to an election duly called to obtain funds to purchase or erect an electric light plant and distribution system. With the monies received from the sale of such bonds the city built a distribution system and a building in which an electric light plant might be erected and installed. Thereafter the city council entered into a contract on behalf of the city with the Fairbanks-Morse Company whereby the Fairbanks-Morse Company agreed to provide and install an electric generating plant in the building belonging to the city and connect the same with the distribution system. For such generating plant, installed and connected with the distribution system, the Fairbanks-Morse Company was to be paid the sum of $27,161.40 in 58 equal installments of $468.30 each.

"Such payments were to be evidenced by pledge orders, the first of which was to be payable thirty days after the installation of the plant and the others thereafter at intervals of thirty days until all were paid. Until all of these pledge orders were paid the plant so installed was to be considered as personal property belonging to the company, and if the city failed to pay any order according to the terms thereof, then the company might repossess itself of the machinery and equipment. Pursuant to the estimates as to the electric requirements of the city and its inhabitants and the cost of maintenance and operation of the plant, the city agreed as to the minimum charge that it should make for light and power, and the maximum that it might pay for salaries and labor in the operation of the plant. The city further agreed to create a special fund to be made up out of the net profits resulting from the operation of the plant, to keep the same intact for use in payment of the pledge orders, and to operate the plant until they were paid. It was also expressly stipulated that the city should not be held liable in any way on account of the purchase of said plant other than for the monthly payments thus to be made out of any net profits resulting from its operation. An ordinance was duly enacted establishing rates and creating a special fund pursuant to the terms of the

contract entered into with the Fairbanks-Morse Company." 59 ND at pp 81–82, 228 NW 819.

Suit was brought by a taxpayer to enjoin the city from carrying out the agreement with the Fairbanks-Morse Company on the grounds: (1) that the city council had no authority to enter into a contract for the purchase and installation of the generating plant and make payment therefor by the means proposed, that the city was authorized to purchase and pay for the construction of an electric light plant only with funds realized from tax levies, from a general bond issue, from special assessments, or from bonds issued under the utility bond clause of Section 183 of the Constitution; and (2) that if the agreement were carried out and the pledge orders issued, such pledge orders would constitute an indebtedness of the city and consequently the constitutional debt limit would be exceeded. This court held that in financing the purchase and installation of the generating plant the city was not limited to funds raised by taxation, the issuance of general bonds, or bonds under the utility bond clause of Section 183, or to special assessments but that it might employ any other lawful method, and that under the general power conferred upon a city to purchase, erect, and maintain an electric light plant the city council might lawfully finance the acquisition of the generating plant and the completion of the distribution system in the manner which they had arranged to do and that the contract between the city and the Fairbanks-Morse Company and the pledge orders issued thereunder would not create an indebtedness within the purview of any of the limitations of Section 183 of the Constitution.

The transaction involved in Lang v. Cavalier took place in 1927 and the action was brought in that year. In 1929 the legislature amended the then existing statute so as to specifically authorize a city to pay the cost of purchasing, erecting, enlarging, improving, or extending an electric light plant or system out of the earnings of such plant or system. Laws 1929, Chapter 172, Sec 4.

The City of Devils Lake took the necessary steps under the statute for the purchase of an electric light and power plant and for financing such purchase with special obligation bonds

payable out of the earnings of the plant. A taxpayer brought suit to enjoin the members of the city commission from issuing and selling the proposed bonds. The plaintiff in such action, among other grounds, asserted:—(1) that there was no power in the city to issue revenue bonds payable from earnings or payable in serial denominations extending over a period of years; and (2) that the proposed issue of special obligation bonds would carry the indebtedness of the city beyond the constitutional debt limit as prescribed by Section 183 of the state constitution. This court held both contentions to be without merit and sustained the right of the city to issue the special obligation bonds. Thomas v. McHugh, 65 ND 149, 256 NW 763.

In 1933 the legislature authorized cities to own, acquire, construct, and operate sewage disposal plants. Laws 1933, Chapter 179 (ND Rev Code 1943, Chapter 40-34). The act provided that the cost of such improvement might be defrayed:—(1) out of the general current tax revenues on hand and appropriated for the purpose, out of the proceeds of the sale of general liability bonds, or partly out of general current tax revenues and the residue out of the sale of general liability bounds; (2) by the issuance of mortgage bonds secured on the property and revenues of the system for not exceeding 60% of the cost of the improvement, the remaining 40% of the total cost to be paid out of general current revenues on hand and appropriated or out of the sale of general liability bonds; or (3) by first mortgage bonds upon the assets and property of the improvement or system for the total cost of the improvement or system and secured also by a pledge of the net revenues of the improvement or system. Laws 1933, Chapter 172, Sec 2.

The City of Fargo took the necessary action under the statute for the construction of a sewage disposal plant, and to defray the total cost under the last method. Action was brought by a taxpayer to enjoin the city and the officers thereof from proceeding with the proposed improvement and from issuing and selling the proposed bonds. The plaintiff asserted, among other grounds, (1) that the bonds would impose a general liability upon the city and would create an indebtedness within the first provision of Section 183 of the Constitution; and (2) that if the

bonds did not fall within the first provisions, they fell within the purview of the utility bond clause of Section 183 and that consequently a majority vote of the electorate was a necessary condition precedent to the issuance of the bonds. In the opinion this court analyzed at some length the provisions of said Chapter 172 and held that the bonds were not general obligations of the city, and did not increase its indebtedness; that under the provisions of the statute and of the bonds they were payable only out of the revenue received from the service charges of the sewage disposal plant or from a sale of the property under foreclosure of the mortgage as provided in the act. In disposing of the contention that the bonds fell within the purview of the utility bond clause of Sec. 183 of the Constitution and might not be issued unless approved at an election, the court said in part:

"It is next contended that the issuance of bonds of the character contemplated without a vote involves a violation of Sec. 183 of the Constitution. . . .

"More specifically, the argument is that it violates the proviso therein 'that any county or city by a majority vote may issue bonds upon a revenue producing utility owned by such county or city, or for the purchasing or acquiring the same or building or establishment thereof, in amounts not exceeding the physical value of such utility, industry or enterprise.' This proviso, in our opinion, contemplates only such bonds as may be issued upon the general credit of the governmental body but which are further  sustained by a revenue producing utility. It will be noticed that this section is concerned primarily, if not exclusively, with the limitation of indebtedness. It fixes the limitation at 5 per cent upon the existing value of the taxable property. Then by an appropriate proviso it permits such limitation to be extended a further step by a vote, and an additional proviso is added which permits a county or city by a majority vote to issue bonds that may exceed the debt limit in any amount equaling the physical value of the utility, industry or enterprise upon which such bonds may be issued. It is the office of a proviso to limit the sense or effect of something that has gone before (50 CJ 834; Lewis's Sutherland, Stat Constr 2d ed Sec 351), and the effect of that part of Sec 183 preceding this proviso

is to prescribe a 5 per cent limitation upon the indebtedness of the enumerated municipalities. This second proviso, like the first, prescribes a condition or conditions to be met when it may be desired to increase such limitation.

"It follows from this that bonds issued under the authority of the act in question which do not increase the indebtedness of the city are not within the proviso of paragraph 1 of Sec. 183 of the Constitution, and, consequently, so far as that section is concerned a vote is not a prerequisite." Anderson v. Fargo, 64 ND at pp 186–187, 250 NW at pp 797–798.

In 1937 the legislature enacted the Revenue Bond Law. Laws 1937, Chapter 104. Such law was embodied in ND Rev Code 1943, Chapter 40–35. Provisions of the law, pertinent here, read as follows:—

40-3502. "The term 'undertaking', as used in this chapter, unless a different meaning clearly appears from the context, shall mean systems, plants, works, instrumentalities, and properties used in revenue producing undertakings, or any combination of two or more of such undertakings, which are used or useful in connection with;

1. The obtaining of a water supply and the conservation, treatment, and disposal of water for public and private uses;

2. The collection, treatment, and disposal of sewage, waste, and storm water; . . .

together with all parts of any such undertaking and all appurtenances thereto, including lands, easements, rights in land, water rights, contract rights, franchises, approaches, dams, reservoirs, generating stations, sewage disposal plants, intercepting sewers, trunk connections, other sewer and water mains, filtration works, pumping stations, and equipment."

40-3503. "Any municipality, in addition to the powers prescribed elsewhere by the laws of this state, shall have the power to:

1. Acquire by gift, purchase, or the exercise of the right of eminent domain, property required to construct, reconstruct, improve, better, or extend any undertaking, whether wholly within or wholly without the municipality or partially within and par-

tially without the municipality, and easements, rights in lands, and water rights in connection therewith;

2. Operate and maintain any undertaking for its own use and for the use of public and private consumers and users within and without the territorial boundaries of the municipality;

3. Prescribe, revise, and collect rates, fees, tolls, or charges for the services, facilities, or commodities furnished by such undertaking, and in anticipation of the collection of the revenues of such undertaking, issue revenue bonds to finance in whole or in part the cost of the acquisition, construction, reconstruction, improvement, betterment, or extension of any undertaking;

4. Pledge to the punctual payment of said bonds and the interest thereon all or any part of the revenues of such undertaking, including the revenues of improvements, betterments, or extensions thereof which may be constructed or acquired subsequent to the issuance of such bonds as well as the revenues of existing systems, plans (plants), works, instrumentalities, and properties of the undertaking so improved, bettered, or extended, or of any part of such undertaking; and

5. Make all contracts, execute all instruments, and do all things necessary or convenient in the exercise of the powers herein granted or in the performance of its covenants or duties or in order to secure the payment of its bonds, but no encumbrance, mortgage, or other pledge of property of the municipality shall be created by any such contract or instrument.

No property of the municipality shall be liable to be forfeited or taken in payment of any bonds issued under this chapter, and no debt on the general credit of the municipality shall be incurred in any manner for any purpose under any provision of this chapter."

40-3513. "Any ordinance or resolution authorizing the issuance of bonds under this chapter to finance, in whole or in part, the acquisition, construction, reconstruction, improvement, betterment, or extension of an undertaking may contain covenants, notwithstanding that such covenants may limit the exercise of powers conferred by this chapter, as to:

1. The rates, fees, tolls, or charges to be charged for the services, facilities, and commodities of said undertaking;

2. The use and disposition of the revenues of said undertaking.

3. The creation and maintenance of reserves or sinking funds and the regulation, use, and disposition thereof; . . .

Nothing in this section or in any other section of this chapter, however, shall authorize any municipality to do anything in any manner or for any purpose which would result in the creation or incurring of a debt or indebtedness, or the issuance of any instrument, which would constitute a bond or debt within the meaning of any provision, limitation, or restriction of the constitution relating to the creation or incurring of a debt or indebtedness or the issuance of an instrument constituting a bond or a debt."

40–3514. "Revenue bonds issued under this chapter shall not be payable from nor charged upon any funds other than the revenue pledged to the payment thereof, nor shall the municipality issuing the same be subject to any pecuniary liability thereon. No holder or holders of any such bonds shall ever have the right to compel any exercise of the taxing power of the municipality to pay any such bonds or the interest thereon, nor to enforce payment thereof against any property of the municipality. Such bonds shall not constitute a charge, lien, nor encumbrance, legal or equitable, upon any property of the municipality. Each bond issued under this chapter shall recite in substance that the bond, including interest thereon, is payable solely from the revenue pledged to the payment thereof, and that the bond does not constitute a debt of the municipality within the meaning of any constitutional or statutory limitation."

The Revenue Bond Law also provides that in case the municipality shall default in the payment of the principal or interest on any of the revenue bonds after the same shall become due, a bondholder or bondholders or the trustee "may apply to the district court of the county in which the undertaking is located for the appointment of a receiver of the undertaking." 40–3516. If a receiver is appointed, it becomes his duty to take possession of the undertaking and to operate and manage the same and to "maintain the undertaking and restore and insure it and keep the same insured, and from time to time," to make all repairs which he deems necessary, proper and expedient.

40–3517. In the exercise of his powers the receiver acts "under the direction and supervision of the court by which he was appointed" and remains at all times subject to the orders and decrees of such court. 40–3519.

The bonds involved in this action conform in all respects with the provisions of the Revenue Bond Law. As has been noted the Revenue Bond Law specifically provides that "no property of the municipality shall be liable to be forfeited or taken in payment of any bonds issued under this chapter, and no debt on the general credit of the municipality shall be incurred in any manner for any purpose under any provision of this chapter." 40–3503. It further provides that revenue bonds issued under such law "shall not be payable from nor charged upon any funds other than the revenue pledged to the payment thereof, nor shall the municipality issuing the same be subject to any pecuniary liability thereon," and that "no holder or holders of any such bonds shall ever have the right to compel any exercise of the taxing power of the municipality to pay any such bonds or the interest thereon, nor to enforce payment thereof against any property of the municipality." It further provides that "such bonds shall not constitute a charge, lien, nor encumbrance, legal or equitable, upon any property of the municipality," and that each bond issued under said law "shall recite in substance that the bond, including interest thereon, is payable solely from the revenue pledged to the payment thereof, and that the bond does not constitute a debt of the municipality within the meaning of any constitutional or statutory limitation." 40–3514.

The provisions of the Revenue Bond Law pursuant to which the bonds involved in this case are to be issued "are as much to be considered terms of the bonds as though such provisions were stated on the faces thereof." Catholic Order of Foresters v. State, 67 ND 228, 234, 271 NW 670, 673, 109 ALR 979, 982.

It is difficult to understand how language could have been employed that more clearly would have indicated a purpose and intention that the revenue bonds should not constitute a debt or general obligation on the part of the city than that which was used in the Revenue Bond Law. The provisions of the

Revenue Bond Law, of the ordinance, and of the proposed bonds themselves make it clear there is no obligation or liability directly, indirectly, or contingently on the part of the city to pay any part of the principal or interest on such revenue bonds out of its general fund or out of any other fund should the special fund prove to be insufficient. According to the plain terms of the statute, and of the ordinance under which the bonds are authorized and will be issued, such bonds are payable as to both principal and interest solely out of the special fund to be established and maintained out of the earnings derived from the operation of the municipal water and sewer utility. The bonds are not secured by mortgage or lien upon any property of the city. The bonds may not be made a charge upon the property of the city or the taxpayers of the city. They are payable solely from income resulting from the operation of the particular property owned by the city and which is to be repaired, improved, and enlarged by use of the proceeds of the revenue bonds so as to more efficiently serve the purpose for which the property has been acquired, constructed and maintained by the city. For their recompense the bondholders must look alone to the fund into which the earnings are placed and out of which it is agreed the bonds are to be paid.

Plaintiff contends, however, that notwithstanding the provisions of the statute, of the ordinance, and of the bonds, the fact that the Revenue Bond Law authorizes, and the ordinance provides, that the revenue of the system as improved,—that is, the revenue of both the existing water and sewer plants and of the additions and improvements to be constructed,—is pledged and set aside for the payment of the revenue bonds constitute such bonds an indebtedness of the city within the constitutional debt limitations. In short, plaintiff invokes the segregation rule announced in Joliet v. Alexander, supra. As has been pointed out the Supreme Court of Illinois, in effect at least, has overruled that part of its decision in the Joliet case where it is said that the pledge of the income from the old plant for the payment of the water fund certificates issued for enlargement or extensions constituted indebtedness of the municipality within the constitutional provision; and certain other courts who had

followed the Joliet decision have receded from their former decisions. While this court has not dealt with this precise question it has held that revenue obligations payable out of revenues produced by a utility plant consisting in part of property belonging to the city, and in part of property to be paid for with the revenue obligations did not constitute a general indebtedness.

Thus, in Lang v. Cavalier, 59 ND 75, 228 NW 819, supra, the earnings of a municipal electric light plant whose property consisted in part of a building and distribution system owned and paid for by the city were pledged for the payment of certain obligations issued by the city for a generating plant, and which obligations were made payable solely out of the earnings of the entire system. In that case the earnings, which were pledged for payment of the generating plant and the installation thereof could be earned only by the use of the property belonging to the city and which the city had paid for with the proceeds of a general bond issue. So, likewise, in Anderson v. Fargo, 64 ND 178, 250 NW 794, supra, the city had constructed and owned an extensive sewer system. The sewage disposal plant could operate only in connection with and by use of the sewer system and all the revenues received from the sewage disposal system were pledged for the payment of the revenue bonds issued for the moneys furnished to construct the sewage disposal plant.

The income from the present water system of the City of Jamestown is not pledged for any other municipal purpose. That system is in such condition that it is imperative that large expenditures be made without delay in order that it may meet the present needs of the city. In view of the condition of the properties and the needs for repair and replacement it does not appear that there is any immediate prospect of any income over and above expense of operation and maintenance and the making of necessary repairs. Indeed it seems probable that if needed replacements and improvements had been made or if provision had been made for the depreciation of the properties, there would have been little, if any, net income during the past. The ordinance authorizing the issuance of the revenue bonds provides that all monies received from the operation of the water and sewer utility shall be credited to a water and sewerage

utility fund and that not less often than once in each calendar month such receipts and income shall be apportioned and there shall be credited to the operation and maintenance account such sum as may be needed, over and above any credit balance then held therein, to pay the current and reasonable expenses of operation, administration, and maintenance for a period of approximately one month plus a reasonable reserve for contingencies; and that next there shall be set aside and credited to the replacement and depreciation account ten per cent of the monies so placed in the water and sewerage utility fund. Under these provisions of the ordinance the earnings are pledged first to defray the reasonable expenses of operation, administration, and maintenance; and ten per cent of the earnings available for disbursement are pledged next for replacement and depreciation. These pledges must be met when the earnings are apportioned each month before any payments may be made to the bondholders.

The amount of the revenue that will be derived during any given period from the operation of a utility such as that in question here is not a fixed, definite, and unchangeable quantity. The amount of revenue may be affected not only by economic conditions but by action of the city council or of the legislature. The constitution of this state provides:—"The legislative assembly shall provide by general law for the organization of municipal corporations restricting their powers as to levying taxes and assessments, borrowing money and contracting debts, and money raised by taxation, loan or assessment for any purpose shall not be diverted to any other purpose except by authority of law." ND Const, Sec 130. The constitution further provides that "the legislative assembly shall not pass any local or special laws" for the "incorporation of cities * * * or changing or amending the charter of any * * * city." ND Const, Sec 69, Subd 33. It is obvious, therefore, that in this state the legislature has the power to define the powers of cities and to prescribe the manner of their exercise. State ex rel. Linde v. Taylor, 33 ND at p 113, 156 NW at p 574, LRA1918B at p 173, Ann Cas 1918A 583; Fargo et al. v. Sathre, ante, 341, 36 NW2d 39.

The contention of the plaintiff that the revenue bonds in ques-

tion here create an indebtedness and general obligation of the defendant city resolves to this:—that the legislature is forbidden by the constitution to authorize cities to issue revenue bonds and to pledge for the payment of revenue bonds issued and sold to defray the cost of construction of an extension or improvement of a revenue producing undertaking the revenues derived from the operation of the entire undertaking, including both the original plant and the extension and improvement to be constructed with the proceeds of the revenue bonds. The contention is devoid of merit.

Every reasonable presumption is in favor of the constitutionality of a statute enacted by the legislature. This presumption is conclusive, unless it is clearly shown that the enactment is prohibited by the constitution of the state or of the United States. The only test of the validity of an act regularly passed by a state legislature is whether it violates any of the express or implied restrictions of the state or Federal constitutions. State ex rel. Linde v. Taylor, 33 ND at p 86, et seq., 156 NW at p 564, LRA1918B, at p 160, Ann Cas 1918A 583.

When it is asserted that action which is authorized by a legislative enactment is forbidden by the constitution, we do not look in the constitution for a grant of power to the legislature to enact such law, we look only to ascertain if it inhibited the legislature from enacting the law. State ex rel. Linde v. Taylor, 33 ND at p 86, 156 NW at p 564, LRA1918B, at p 160, Ann Cas 1918A 583; 11 Am Jur, Constitutional Law § 18, p 619, et seq.

American Jurisprudence (11 Am Jur, Constitutional Law § 18, at p 619, et seq.) says:

"A doctrine firmly settled in the law is that a state constitution is in no manner a grant of power. It operates solely as a limitation of power. All power which is not limited by the Constitution inheres in the people, and an act of a state legislature is legal when the Constitution contains no prohibition against it."

The general object of the Revenue Bond Law is to authorize a municipality to make improvements and additions to a revenue producing undertaking owned and operated by it and to pay

therefor by issuance and sale of bonds payable solely from the income derived from the use of the particular properties to be improved or extended.  To that end the legislature by such law empowers a municipality to provide for the segregation and impoundment of anticipated future revenues of a particular undertaking and for the pledging of such revenues. for present reinvestment in the improvement of the existing plant, through the operation of which such revenues are earned.  The revenue bonds authorized under the law are payable solely out of revenues, as they are received and placed in the special fund.  The municipality does not incur any debt or any obligation other than to disburse the monies that are realized from the operation of the undertaking and placed in the special fund.  Such revenue bonds do not draw upon the general resources of the municipality so that the amount withdrawn must be replenished by taxation.

The weight of authority sustains the view that a city which owns and operates a utility does not create an indebtedness within the meaning of the constitutional debt limitation by pledging in payment of revenue bonds issued and sold to finance an extension or improvement of such utility plant, the revenue derived from the entire plant, and not merely from the addition or improvement.  Ward v. Chicago, 34 Ill 167, 173 NE 813, supra; Edwardsville v. Jenkins, 376 Ill 327, 33 NE2d 598, 134 ALR 891; Guthrie v. Mesa, 47 Ariz 336, 56 P2d 655; Searle v. Haxtun, 84 Colo 494, 271 P 629; State v. Miami, 113 Fla 280, 152 So 6; Farmers State Bank v. Conrad, 100 Mont 415, 47 P2d 853; Underwood v. Fairbanks, Morse & Co., 205 Ind 316, 185 NE 118; Grossman v. Public Water Dist. No. 1, 339 Mo 344, 96 SW2d 701, supra; Struble v. Nelson, 217 Minn 610, 15 NW2d 101; Department of Water & Power v. Vroman, 218 Cal 206, 22 P 698, 703; State v. Miami, 157 Fla 726, 27 So2d 118; Southern Nebraska Power Co. v. Deshler, 130 Neb 598, 265 NW 880; State v. Miami, 113 Fla 280, 152 So 6; 38 Am Jur 155, Municipal Corporations, § 474.

We are all agreed that the legislative assembly did not transcend its constitutional powers in conferring upon cities the authority to issue revenue bonds in the circumstances and for the purposes prescribed by the Revenue Bond Law.  Such bonds

do not create any indebtedness or liability on the part of a city that issues the bonds, and do not fall within any of the provisions of Sec. 183 of the constitution.

The contentions that the issuance and sale of the revenue bonds in question here are contrary to the provisions of the Revenue Bond Law are all predicated upon the proposition that such bonds are general obligations and create an indebtedness on the part of the city within the purview of Section 183 of the constitution. These contentions are fully disposed of by what has been said above.

The judgment appealed from is affirmed.

NUESSLE, Ch. J., BURKE, CHRISTIANSON and MORRIS, JJ., and GRIMSON, District J., concur.

BURR, J., did not participate.