[File No. 6284.]

GUS THOMAS, Appellant, v. HARRY E. McHUGH et al., as Members of the Board of City Commissioners of the City of Devils Lake, North Dakota, Respondents.

(256 N. W. 763.)

150

Opinion filed October 3, 1934.

*L. D. Gooler,* for appellant.

*Lawrence, Murphy, Fuller & Powers,* for respondents.

MOELLRING, J. This is an appeal from an order of the district court of Ramsey county sustaining a demurrer to plaintiff's complaint.

The defendants demurred to the complaint upon the ground "That said complaint shows upon the face thereof that the same does not constitute or set forth a cause of action against the defendants or either of them."

On this appeal plaintiff assigns specifications of error or reasons why the demurrer to the complaint should be overruled. They are as follows:

(1) The city is without power to issue bonds payable serially over a period of years, or otherwise, to be made payable from the earnings of the utility;

(2) The city is without power to covenant and contract by resolution, ordinance or otherwise, for a pledge and appropriation of earnings of future years to the payment of the proposed bonds;

(3) The agreement to pledge and apply the earnings to the payment of the bonds violates the provisions of Laws 1933, chapter 181;

(4) The city is without power to agree to maintain rates of charge for electric current sufficient to pay and discharge the bonds at maturity;

(5) The covenant to maintain rates sufficient to pay the bonds at maturity, violates section 4609c3, 1925 Supplement to the Compiled Laws, 1913; Laws 1933, chapter 220, vesting in the board of railroad commissioners the power to review and change rates of utilities;

(6) The contract to erect the plant and commence operations thereof on completion of the proposed loan, violates the provisions of Laws 1929, chapter 198; Laws 1927, chapter 305, requiring a certificate of convenience and necessity from the board of railroad commissioners before commencement of operations by public utility;

(7) The city is without power to issue and sell bonds without first advertising the same for sale, as required by Laws 1927, chapter 196, § 17, as amended by Laws 1929, chapter 170;

(8) The issuance of the proposed bonds in this case will constitute a debt and liability of the city in violation of the Constitution, section 183, and Laws 1927, chapter 196, § 3, prescribing the limitation of indebtedness of municipalities;

(9) The threatened issuance of bonds and the making of a proposed

contract to support the same violates Laws 1933, chapter 168, § 4, in that the said section provides that all proposed bond issues of any city shall, before being submitted to the city for a vote of the electors, be submitted to the board of budget review for appeal.

(10) The special election is void for the reason that the question stated upon the ballot submitted to the electors is a double question, and contains the statement of more than one proposition upon which separate elections should be held;

(11) The statutes upon which defendants maintain power to act as herein proposed are void.

The demurrer presents the legal question, whether or not a municipal corporation, such as the city of Devils Lake, can, under our laws, purchase or erect and municipally own and operate an electrical generating and distributing plant for the city's own uses, and for the convenience of its inhabitants and industries, and pay the cost of the same solely from the earnings of the plant.

As incidental to this main issue arise the further questions: (a) Whether the city can, in furtherance of such purpose, enter into a valid contract to that end, and pledge its faith and credit to the effect that it will establish a schedule of rates for electric current adequate to meet the purchase price, with the earnings assured for such purpose. (b) Whether such purchase price can be paid serially in installments extending over a period of years, with interest. (c) If such can be done under our laws, then, as peculiar to the instant case, would the indebtedness purported to be authorized by the voters in the amount of $400,000 be a general obligation of the city, and in excess of the constitutional debt limit? (d) Whether the proper procedure has been pursued in the premises.

The city bases its authority for purchasing or erecting an electrical plant by virtue of § 1, chapter 172, Session Laws 1929, which section reads:

"Any city, village or town is authorized and empowered to purchase, erect, operate and maintain, enlarge, improve and extend, or lease from any person, firm or corporation, . . . any electric light and power plant, site buildings and equipment thereof, or any electric distribution system and equipment thereof or any electric transmission line and equipment thereof, . . . or all or any part of (or) parts of any

of such plants, systems and lines, and any interest in any such plant, systems or lines within and without the corporate limits of such city, village or town for the purpose of furnishing or procuring to be furnished electric energy for heat, light and power . . . for such city, village or town and its inhabitants and industries in the manner herein provided."

It is evident that this section gives a municipality the fundamental power to purchase, erect or lease an electrical plant.

The city contends, further, that it has authority to contract for the erection or construction of such plant, and pay for the same exclusively from the earnings, which authority is claimed by virtue of § 4 of the same chapter. We quote the section:

"Any such city, village or town may pay the cost of purchasing, erecting, enlarging, improving, extending or leasing any such plant, system or line, or any part thereof, either *out of the earnings of such plant, system or line,* or by issuing special assessment warrants as hereinafter provided, or by issuing bonds of such municipality hereinafter provided, or partly by such special assessment warrants and partly by such bonds, *or partly out of such earnings, provided, however, that when such cost or any part thereof is to be paid out of earnings, then such cost or the part thereof which is to be paid out of earnings shall not become a general obligation of the municipality payable out of money raised through taxation, but a special obligation payable solely and exclusively out of the earnings derived from the operation of such plant, system or line."*

The mayor and board of aldermen of the city of Devils Lake by resolution declared the necessity of procuring an electric plant, for the purpose of furnishing electrical energy for heat, light and power for the city, its inhabitants and industries; and further resolved that the city should issue its bonds in an amount not exceeding $400,000, with interest not to exceed 4½ per cent per annum, which bonds should mature serially extending over a period of twenty years, to cover the purchase price; and resolved and pledged that the city would maintain adequate rates in an amount sufficient to pay the principal and interest as the same matured, payable solely from the earnings of the plant, and without any general obligation on the part of the city. They also resolved to submit the matter to the voters. Pursuant thereto a

special election was held at which the proposition was submitted to the electorate and carried, more than two-thirds of the voters favoring the same. The foregoing appear as part of the allegations in the complaint.

It is contended by appellant that there is no power in the city to issue revenue bonds payable from earnings, or payable in serial denominations extending over a period of years. The statute clearly grants the authority to a municipality to purchase, erect or lease an electrical plant. The same chapter also grants the power to pay the purchase price solely from earnings. This implies that a contract may be entered into with deferred obligations, as the earnings must necessarily lie in the future, and originate from the operation of the plant. If it is conceded that the right to contract exists on the part of the municipality with reference to the subject, then it is not material what form the contract shall take, as the statute is general in its terms.

The right to procure a plant and the right to pay for the same from earnings, are rights specifically granted. Since the act does not provide a definite manner in which this grant shall be carried out, the law necessarily implies considerable latitude in the governing body, with reference to the accomplishment of the object sought.

In the case of Lang v. Cavalier, 59 N. D. 75, 228 N. W. 819, in defining grants of powers to municipalities, this court held:

"A municipal corporation takes its powers from the statutes which give it life and has none which are not either expressly or impliedly conferred thereby or essential to effectuate the purposes of its creation. In defining the corporation's powers, the rule of strict construction applies and any doubt as to their existence or extent must be resolved against the corporation; but the existence and extent of such powers having been determined and measured, the rule of strict construction no longer applies, and the manner and means of exercising the same, where not prescribed by the legislature, are left to the discretion of the municipal authorities."

As already indicated, the form of contract which the governing board of a municipality may enter into for the purpose of procuring such utility, is quite immaterial so long as it contains the essentials of a binding agreement. The fact that the city proposes to place this contract in the form of bonds, with specific covenants and limitations,

must be considered and construed in the same light as any other bilateral obligation.

Moreover, said chapter having given municipalities the broad general power to procure a municipal electric plant, and to pay for the same exclusively out of earnings, this general power implies such incidental powers as are necessary to carry it into effect.

In the recent case of Wyatt v. Manning, 217 Iowa, 929, 250 N. W. 141, the court had occasion to construe a statute giving municipalities the authority to acquire an electric plant, payable, in part or in whole, out of earnings of the plant. The statute provides, further, that such contract shall not constitute a general obligation, or be payable in any manner by taxation; and also provides that the proposition must be submitted to the electors of the municipality. The particular provisions of the Iowa statutes referred to, are known as §§ 6134d1–d2–d3, Code of 1931, and are quite similar to our laws with reference to the same subjects. The town council had declared the necessity for such an institution, and authorized a special election for the submission of the matter to the electors. The question submitted was, whether or not the town of Manning should procure such a plant, not exceeding a maximum expenditure designated, the purchase price to be paid solely from earnings without incurring any indebtedness therefor by the town itself. The election was favorable, and the ballot submitted authorized the town board to "establish, erect, maintain and operate a municipal electric light and power plant," etc.

In commenting upon the powers conferred by the statute, the court said: "After the people, in accordance with § 6134–d3, have authorized a plant by their vote, the powers granted by § 6134–d1 are automatically conferred upon the city council. Every elector knows that if the proposition to establish the plant in the method outlined by §§ 6134–d1 and 6134–d2 is carried, the council may finance the same under any method provided in § 6134–d1." See Young v. Ann Arbor, 267 Mich. 241, 255 N. W. 579.

Appellant cites the case of Van Eaton v. Sidney, 211 Iowa, 986, 231 N. W. 475, 71 A.L.R. 820, but this case is not in point, as it merely holds that the power to purchase or to establish a municipal plant, does not create the implied power to enter into an undertaking to pay for the same by means of pledged warrants. Moreover, since

the latter case was decided the Iowa statute has been changed with reference to the powers of municipalities in procuring and operating public utilities, as indicated in the case of Wyatt v. Manning, 217 Iowa, 929, 250 N. W. 141, supra.

Appellant contends that the city is without contractual power to maintain rates in amounts sufficient to pay and discharge the bonds, in view of the fact that a municipality might, in the exercise of pretended authority to pay the purchase price from earnings only, find it necessary to fix rates of service at a point that would be quite exorbitant or confiscatory, and thereby occasion the exercise of a reviewing authority.

The complaint does not allege, nor is it contended that the rates proposed to be fixed by the city of Devils Lake, are exorbitant or unreasonable. We cannot determine that an untenable position may arise, upon a mere contingency or possibility that rates may become exorbitant or prohibitive. The complaint does not present a probability of such an occurrence, nor can we speculate upon the same. We must assume that a municipality, in obligating itself, like an individual, takes into consideration and contemplates the common experiences of mankind with reference to similar obligations, as to whether or not it can reasonably and in all probability carry out its contract. If we concede that it is possible, though not probable, that circumstances may arise whereby an obligating party may be unable to fulfill its promises, this does not militate against the business sagacity or efficiency of the contracting party or the legality of the obligation.

However, such contracts as contemplated are enforceable in the courts, in the same manner and with the same remedies, within the terms of the obligations, as are applicable to contracts generally. Bell v. Fayette, 325 Mo. 75, 28 S. W. (2d) 356.

It is contended that the city has not the authority to purchase or erect a municipally owned electric plant, for the reason, it is urged, that before proceeding to the establishment of the plant in the first instance, it is necessary to secure authority in the form of a certificate of convenience and necessity from the board of railroad commissioners. It is also contended by appellant, that said municipality could not enter into an indebtedness or obligate itself for the purchase or erection of a plant, without first securing authority from the said board of railroad

commissioners; and, further, with reference to the matter of rates, it is contended that the city has not the power to freely contract that it will maintain adequate rates sufficient to pay the obligations with interest, for the reason that the matter of fixing rates is within the jurisdiction of the said board of railroad commissioners and not in the city board. Consequently, it is urged, the city cannot enter into a binding contract with reference to that over which it has no control.

The questions presented, therefore, are whether the legislative enactments are sufficiently broad to confer on the board of railroad commissioners the authority over a municipality, to determine not only when it may or may not engage in public utility service, but to determine, also, when a municipality may or may not enter into an indebtedness for the purpose of establishing a municipally owned plant; and, when established, fix the rates of service for such plant.

Appellant contends, as to the first proposition, that such authority is derived from chapter 235, Laws 1927, as amended by chapter 198, Laws 1929, and as to the two latter propositions that the authority therefor is derived from §§ 4609c2, 4609c3 and 4609c20, 1925 Supplement to the Compiled Laws 1913 (§§ 2, 3 and 20, chapter 192, Laws 1919). Prior to 1915 the board of railroad commissioners had no authority of any kind or character over municipally owned electric plants. By the enactment of chapter 208, Laws 1915, said board was permitted to fix rates of service for such industry.

However, § 55, chapter 192, Laws 1919, specifically repeals said chapter 208, Laws 1915, in toto; but, it is contended that the broad language contained in § 2 of said chapter 192, Laws 1919 (§ 4609c2, 1925 Supplement to the Compiled Laws 1913), re-enacts the provisions contained in the 1915 law, and reliance is made upon the language of said section, which reads:

"The jurisdiction of the commissioners shall extend to and include: . . . (d) electric light companies for the purpose of generating and distributing light, heat or power; . . . (j) all other public utility corporations and all persons, associations, corporations, or *agencies* employed or engaged in any of the business hereinafter enumerated.

"The words 'public utility' used in this act shall include all associations, persons, firms, corporations and *agencies* engaged or employed in any business herein enumerated or any other public utility business,

whether above enumerated or not and whether incorporated or not . . . ." (Italics ours.)

It is asserted that the term "agency" is of such broad significance that municipally owned plants come within the purview of the act. We cannot arrive at the true legislative intent, however, without considering other provisions of the law. Section 23 of the same chapter (chapter 192, Laws 1919) provides:

"Nothing in this Act shall authorize the Commissioners to make any order affecting rates, tolls or charges, contracts, or services rendered or the safety, adequacy, sufficiency of facilities, or the rules or regulations of any public utility owned and operated by the State, city, county, township, town or village or any other political subdivision of the State, or any public utility that is not operated for profit, but all other provisions herein shall apply to such utilities.

"Provided, however, that any and all telephone and telegraph utilities so owned or operated shall be subject to the jurisdiction of the Commissioners and to the provisions contained in §§ 7 and 8 of this Act." (§ 4609c23, 1925 Supplement to the Compiled Laws 1913.)

Section 23 clarifies said §§ 2 and 3 to the extent that the board of railroad commissioners has no authority to fix rates of a municipally owned electric utility. Likewise, it is apparent that the board has no authority to determine whether or when a municipality may issue bonds or incur indebtedness in furtherance of this kind of utility. As the law specifically provides that the board shall have no jurisdiction over any "contracts" the municipality may enter into with reference thereto, the issuance of bonds for the purpose of procuring such utility is certainly a "contract," within the meaning of the law, between the municipality and the purchasers or holders of the bonds.

The contention that the municipality has no power to procure an electric plant payable from earnings, without first securing authority from the board of railroad commissioners in the form of a certificate of convenience and necessity, cannot be sustained. Appellant relies upon chapter 235, Laws 1927, as amended by chapter 198, Laws 1929. Said law provides, in part:

"No public utility, as defined in § 4609c2, 1925 Supplement to the 1913 Compiled Laws of North Dakota (§ 2, chapter 192, Laws 1919) shall henceforth begin the construction or operation of a public utility

plant or system, or of any extension thereof, without first obtaining from the board of railroad commissioners of this stat' 'a certificate that public convenience and necessity require, or will require, such construction and operation," etc.

We have already cited and construed herein said § 4609c2, 1925 Supplement to the Compiled Laws, 1913 (§ 2, chapter 192, Laws 1919), referred to in the provisions of the law just quoted. To hold as appellant contends, it would be necessary for us to determine that the subsequent chapters amended said laws concerning municipal plants by implication, as a municipally owned utility is not specifically mentioned in the subsequent enactments. No such intention is indicated on the part of the legislature.

The provisions of chapter 198, Laws 1929, pertinent to the subject under consideration, were originally enacted and existed in the same form and language in chapter 235, Laws 1927. This latter chapter is the first instance in our laws, where it is necessary to procure a certificate of convenience and necessity from the board of railroad commissioners before the establishment of a public utility.

However, at the same legislative session in 1927 there was also enacted chapter 197, parts of which chapter this court construed in the case of Lang v. Cavalier, 59 N. D. 75, 228 N. W. 819, supra. Said chapter 197, § 1, provides:

"Any city, village or town is authorized and empowered to purchase, erect, operate and maintain, enlarge, improve and extend, or lease from any person, firm or corporation . . . any electric light and power plant, site, buildings and equipment thereof, or any electric distribution system and equipment thereof," etc.

Section 2 of the same act provides:

"No such city, village or town officers shall purchase, erect or substantially enlarge, improve, extend or lease from others any such plant, system or line unless and until the proposition of doing so shall have been submitted under authority of a resolution of the governing body to the qualified voters of said city, village or town at an annual or special election called, held and conducted upon the notice and in the manner specified by law for the election of the governing body of such city, village or town, and shall have been approved by a majority of such voters voting thereon."

The question arises, did the legislature intend, in view of the enactment of these twc neasures, and at the same session of the legislature, that said chapter 235, requiring a certificate of convenience and necessity before proceeding to the establishment of an electric utility, should apply to a municipality contemplating such venture? We do not believe the measure so intends.

The purpose of securing a determination by the board of railroad commissioners in the first instance, as provided by said chapter 235, Laws 1927,—and as it exists in amended form in chapter 198, Laws 1929,—is to lodge with the commissioners a discretion, of a judicial character, to determine for the community whether a necessity exists for the utility, and to prevent a community or municipality from being afflicted with a multitude of utilities of the same character, and which might prove to be detrimental to the best interests of the community. The board of railroad commissioners, in such instances, represent and speak for the people, in issuing or denying such certificate of convenience and necessity.

However, if the inhabitants of a community desire to have the electrical energy which they use, generated and distributed by their own municipal plant, that is a matter entirely of their own concern, and no one is in a better position to pass upon the convenience and necessity of such an institution than the inhabitants of the community or municipality to be affected by it.

Said § 4609c23, 1925 Supplement to the Compiled Laws 1913 (§ 23, chap. 192, Laws 1919), stands out boldly to the effect that the board of railroad commissioners does not have any authority in the circumstances described by said section; and it is apparent to us that the subsequent enactments did not confer additional authority, with reference thereto, upon said board.

Our attention is called to chapter 220, Laws 1933, which provides for supervision, regulation and determination of rates of public utility concerns. There is nothing in this enactment, however, to indicate that the legislature intended to apply this chapter, in any manner, to municipally owned electric plants.

In defining the jurisdiction of the commissioners, the act follows, substantially, the provisions of the original enactment (§ 2, chap. 192, Laws 1919; § 4609c2, 1925 Supplement to the Compiled Laws 1913),

except that it does not cover the matters in said section with reference to warehouses, packing and cold-storage companies for the marketing, storage, or handling of food and other agricultural products, or to stock yard companies. It is evident that the purpose of this statute is to provide procedure for negotiations and compromises with reference to reduction of utility rates, and to establish a plan for petitioning the commissioners and for hearings thereon, where a reduction of rates is requested. There is nothing in the measure to indicate any intention to amend or repeal said § 4609c23 (§ 23, chap. 192, Laws 1919).

Another matter bearing upon this question of the power of the board of railroad commissioners is § 139 of the Constitution of this state. Said section provides:

"No law shall be passed by the legislative assembly granting the right to construct and operate a street railroad, telegraph, telephone or electric light plant within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied for such purposes."

A construction of the provisions of this section of our Constitution was made by this court in the case of Chrysler Light & P. Co. v. Belfield, 58 N. D. 33, 43, 224 N. W. 871, 63 A.L.R. 1337. The court held that where a franchise had been granted to the plaintiff on the condition that said plaintiff would furnish electricity to the defendant for street lighting purposes at certain rates, that plaintiff was bound thereby and that the board of railroad commissioners had no authority to interfere with the rates so contracted to be furnished by the electric company.

In this case the court said, in part:

"The power reserved by § 139 of the Constitution to a village or city to either grant or refuse permission to an electric light company to occupy the streets of such village or city with the structures of such lighting company is not limited to a simple granting or denial of permission to use the streets for such purposes; a village or city may permit such use of its streets on certain conditions only, and if the electric light company accepts the permission or franchise so granted, all valid

conditions or restrictions attached thereto become binding upon it." And again the court said:

"The board of railroad commissioners has only such powers to regulate rates of public utilities as have been conferred upon it by the legislature. Such board can initiate no public policies of its own; it can act in no field which the legislature has not authorized it to enter. Backus-Brooks Co. v. Northern P. R. Co. (C. C. A. 8th) 21 F. (2d) 4; Idaho Power Co. v. Thompson, 19 F. (2d) 547. See also State ex rel. Lemke v. Chicago & N. W. R. Co. 46 N. D. 313, 179 N. W. 378.

"The power to regulate rates of electric light companies was conferred upon the board of railroad commissioners by chapter 192, Laws 1919, commonly known as the Public Utilities Act. This act furnishes the sole basis for the power sought to be exercised by the board of railroad commissioners in making the order involved here. If the power to make such order is not conferred thereby it admittedly does not exist.

"We fail to find in the Public Utilities Act any language indicative of a legislative intention to confer any authority upon the board of railroad commissioners to interfere with the rates for electric current to be furnished by an electric light company to a city, where such rates are fixed by contract in the franchise granted by the city to the electric light company."

The foregoing is pertinent to the instant case. See also Western Electric Co. v. Jamestown, 47 N. D. 157, 181 N. W. 363.

The contention of appellant that an attempt to covenant and pledge the earnings would be an appropriation of such earnings in violation of chapter 181, Laws 1933, cannot be sustained. This chapter provides that the earnings of a municipal plant must be placed in a special fund and applied only to the cost of operation, maintenance, enlargement, repairs, alteration, improvement and extension of such plant, except that during any fiscal year not to exceed 10 per cent of the gross receipts may be applied to the general or other funds of the municipality. There is nothing in the law or the title of the enactment to indicate that the same applies, or was intended to apply, to municipally owned plants where the purchase price is payable out of earnings. To hold that this chapter is applicable in such instances, would, in practical effect, render nugatory the provisions of our laws with reference to the procurement

of an electric plant where the purchase price is payable from the net earnings of the plant.

Applying the usual rules for interpreting statutes, we must look to the object sought. This is not difficult to discover. A practice had existed, with some municipal plants, to use the earnings for general or other purposes, not leaving sufficient for the operating expenses, repairs, replacements, and the ordinary expansion of the plant; and the purpose of this chapter is to curb the zeal with which some boards were applying the net income from the earnings, to the detriment of the plant and the industry itself. Such was the object sought, and there was no intention to hamper or defeat those municipalities where the net income from earnings is applied toward the purchase price of the plant.

The contention that the proposed bond issue must be submitted to the board of budget review, as provided by § 4, chapter 168, Laws 1933, is without merit. This measure has reference to general obligation bonds only. Said § 4 provides, that the proposed bond issues of a city shall, before being submitted to the vote of the electors, be submitted to the board of budget review for approval, disapproval or modification. If the board disapproves, it shall not be submitted to the voters unless "the governing board of such taxing district" is requested to do so by a petition signed by not less than twenty-five per cent of the electors of the district," etc. This section clearly indicates that it has reference to those bonds that are payable by general taxation only, and has no concern with a municipally owned plant, the purchase price of which is payable from earnings.

It is contended, further, that the city of Devils Lake is about to issue and sell special bonds to be redeemed out of earnings only, without complying with § 17, chapter 196, Laws 1927, as amended by chapter 170, Laws 1929, § 2. This section provides that certain bonds of a municipality cannot be sold, without first advertising for bids.

There is no merit, however, to this contention. Subdivision 7, section 1, of the original enactment, specifically provides: "This act is not applicable: (a) To issue of bonds, warrants or other forms of public securities issued on account of public improvements and for the payment of which special assessments are or shall be levied upon and against property benefited thereby which do not constitute, at the time of their

issuance, a general obligation or fixed liability of the municipality issuing the same;" etc.

In the recent case of Young v. Ann Arbor, 267 Mich. 241, 255 N. W. 579, supra, in construing a statute authorizing public improvements payable out of net earnings from such improvement, the court said, in part:

"The general object of the act in question is to authorize municipal and quasi-municipal corporations named therein to make public improvements and pay therefor by bonds payable from the income to be derived from their operation, and all the rest of the statute is germane to this main object."

The chapter plainly indicates that it applies to general obligation bonds only. It does not pertain to those obligations payable by special assessments, nor could it apply to an indebtedness that is made payable out of a special fund, such as is involved in the instant case. The general power conferred by chapter 172, Laws 1929, allows broad discretion in the governing board, in carrying out the mandate of the people, with reference to ways and means in the procurement of the plant; and, in the absence of a statute providing otherwise, their discretion must govern the manner of placing or disposing of the bonds.

Appellant's assignment No. 10 challenges the validity of the special election that purports to authorize procurement of the plant. It is first contended that the election is void, in that the ballot presents a dual question, namely, the purchase or erection of an electric light plant; and that these two separate propositions cannot be thus submitted jointly and in the alternative on one ballot. The second objection urged is that the election is void because the ballot is irregular, in that there was added to and associated with the question whether the city should acquire a plant, the further and separate proposition of the issue of bonds payable from earnings; and a third objection is made that the election is void for the reason that the ballot declares further, that the bonds so issued shall be secured by lien upon the proposed plant.

The ballot submitted to the voters is in the following form:

"Shall the city of Devils Lake be authorized to purchase, acquire, build or establish an electric light and power plant, site, buildings, distribution system and equipment thereof at a cost of not to exceed Four Hundred Thousand Dollars ($400,000.00), and issue its special obliga-

tion bonds therefor, with interest at the rate of not to exceed four and one-half per cent ($4\frac{1}{2}\%$) per annum, secured by a lien upon such plant and its earnings and payable solely and exclusively out of the earnings of such plant and shall not become a general obligation of said city payable out of money raised through taxation.

☐ Yes.

☐ No."

The first contention is identical with an objection raised in the case of Lang v. Cavalier, supra, and was decided by the court adversely to the contentions of the appellant herein. The question submitted to the voters was as follows: "Shall the city of Cavalier purchase or erect and operate and maintain an electric light and power plant and distribution system for the purpose of furnishing electric energy for heat, light and power purposes for said city and its inhabitants and industries?" In determining the matter this court had the same provisions of our statute before it for construction. (§ 2, chap. 197, Laws 1927, now contained in § 2, chap. 172, Laws 1929.) It is there held: "Where pursuant to the provisions of this section the proposition submitted was as to whether the city should 'purchase or erect' a public utility the single question of public ownership was properly submitted to the electors, leaving the determination as to whether the city should purchase a plant already in existence, or itself erect a plant, to the discretion of its officers as incidental to the carrying out of the policy of public ownership determined on by the electors."

In so deciding said matter, the court followed the rule in Logan v. Bismarck, 49 N. D. 1178, 194 N. W. 908, where the question submitted to the voters was whether bonds should issue "for the purpose of constructing or purchasing waterworks." It was contended that this presented a dual question. This court, however, held that the question was single and distinct, in that the question voted upon was whether or not bonds should be issued for the purpose of providing a water supply for the city.

In the instant case the additional matter on the ballot, that the plant should not cost to exceed $400,000, the purchase price to be paid from earnings, only, does not warrant application of a different rule. The proposition submitted to the voters was the single question, whether or

not the city of Devils Lake should procure and conduct a municipal electric utility plant payable from earnings only, leaving the questions, how it shall be procured, and how much it shall cost within the limitations prescribed, to the city's governing board. An authority in point is Wyatt v. Manning, 217 Iowa, 929, 250 N. W. 141, supra.

With reference to the third contention that the ballot purports to authorize a lien upon the plant to secure the special obligation bonds, it is admitted in the complaint that the governing board of the city has no intention of carrying out this feature, but that it is intended—and the bonds shall so provide—that the earnings of the plant be irrevocably pledged for the payment of the bonds; that from such earnings there shall be paid, first, the necessary and reasonable cost of maintenance and operation of the plant, and the remainder thereof shall be held in trust for the benefit of the holders of the bonds, for the purpose of meeting principal and interest as the same mature.

It is noted that our statute does not contain any provision with reference to a lien on the plant. As it is conceded that the city has no intention of carrying into effect any purported lien, the fact that the same is mentioned in the ballot may well be treated as surplusage. State ex rel. Utah Sav. & T. Co. v. Salt Lake City, 35 Utah, 25, 99 P. 255, 18 Ann. Cas. 1130.

Certainly, the municipality cannot be prejudiced, nor can the voters feel aggrieved, if the governing board is able to accomplish the end sought by placing a lighter burden upon the municipality than contemplated by the voters, in contra-distinction to the prejudice which is presumed to result where the board places a heavier burden than authorized by the electors.

The contention of the plaintiff, that the issuance of special obligation bonds in the amount of $400,000 would carry the indebtedness of the city beyond the constitutional debt limit as provided in § 183, State Constitution, is not tenable.

In the case of Lang v. Cavalier, 59 N. D. 75, 228 N. W. 819, supra, this court held that where a part of the obligation incurred for purchasing a municipal electric plant was payable solely from the earnings, that part of the obligation, so payable, did not come within the character of debt contemplated by the Constitution and, therefore, was not touched upon or limited by said section of the Constitution. In so de-

termining the matter, the court followed the rules of interpretation generally adopted in construing such provisions. We quote from the opinion:

"Though the question we have been considering is novel in this jurisdiction, much authority thereon may be found among the decisions of other courts, and an examination of these cases discloses that while there is some dissent, nevertheless the great weight of authority is to the effect that a municipality does not create an indebtedness within the purview of prohibitions against incurring indebtedness by purchasing property to be paid for wholly out of the income therefrom with no general liability. See Shields v. Loveland, 74 Colo. 27, 218 P. 913; Fox v. Bicknell, 193 Ind. 537, 141 N. E. 222; Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Kasch v. Miller, 104 Ohio St. 281, 135 N. E. 813; Butler v. Ashland, 113 Or. 174, 232 P. 655; Barnes v. Lehi City, 74 Utah, 321, 279 P. 878; Winston v. Spokane, 12 Wash. 524, 41 P. 888; Uhler v. Olympia, 87 Wash. 1, 151 P. 117, 152 P. 998; Connor v. Marshfield, 128 Wis. 280, 107 N. W. 639; notes in 37 L.R.A.(N.S.) 1058, and L.R.A.1917E, 437; 44 C. J. 1131. Authorities to the contrary are Feil v. Couer d'Alene, 23 Idaho, 32, 129 P. 643, 43 L.R.A. (N.S.) 1095; Ottumwa v. City Water Supply Co. (C. C. A. 8th) 119 F. 315, 59 L.R.A. 604; Lesser v. Warren, 237 Pa. 501, 85 A. 839, 43 L.R.A.(N.S.) 839."

We note that the general trend of later decisions follows the construction adopted in Lang v. Cavalier, 59 N. D. 75, 228 N. W. 819, supra, and by the great weight of authority. See also Miller v. Buhl, 48 Idaho, 668, 284 P. 843, 72 A.L.R. 682, and note page 688; Bell v. Fayette, 325 Mo. 75, 28 S. W. (2d) 356; Wyatt v. Manning, 217 Iowa, 929, 250 N. W. 141; Young v. Ann Arbor, 267 Mich. 241, 255 N. W. 579.

We are convinced that the complaint does not state a cause of action against the defendants, and that the trial court did not err in sustaining the demurrer. The order is affirmed, with costs on this appeal in favor of the defendants.

BURR, Ch. J., and NUESSLE, BURKE and CHRISTIANSON, JJ., concur.