STATE of North Dakota, ex rel. John S. LESMEISTER, in his capacity as State Treasurer of the State of North Dakota and as a resident and taxpayer of the State of North Dakota, Petitioner,

v.

Allen OLSON, Robert Wefald, and Kent Jones, as members of the Industrial Commission of North Dakota, and Allen Olson, Kent Jones, Florenz Bjornson, Guy Larson, Henry Schank, Alvin Kramer, Garvin Jacobson, Ray Hutton, and Bernie Voulek, as members of the North Dakota Water Commission, Respondents.

Civ. No. 10719.

Supreme Court of North Dakota.

Aug. 16, 1984.

Thomas F. Kelsch, Sp. Asst. Atty. Gen., of Kelsch, Kelsch, Bennett, Ruff & Austin, Bismarck, for petitioner.

Brian D. Neugebauer, Sp. Asst. Atty. Gen., of Ohnstad, Twichell, Breitling, Rosenvold, Wanner, Nelson, Neugebauer & Maring, West Fargo, for respondents. Appearances by Daniel R. Twichell, Sp. Asst. Atty. Gen., and Timothy E. Pickrell, of Chapman & Cutler, Chicago, Ill.

VANDE WALLE, Justice.

The State of North Dakota, on the relation of the State Treasurer, John Steven Lesmeister, seeks to invoke the original jurisdiction of this court for a declaratory judgment holding certain statutes unconstitutional and seeks an injunction prohibiting the issuance of bonds to finance the Southwest Pipeline. The relevant facts have been stipulated by the parties.

The 1983 Legislative Assembly enacted legislation to provide for the construction and financing of the Southwest Pipeline. The Southwest Pipeline project would attempt to alleviate water shortages in the southwest corner of the State by treating and transporting water from the Missouri River to various communities and industrial users in that portion of the State. The estimated construction cost of the Southwest Pipeline is approximately $100,000,-000.

The 1983 Legislature passed three bills which created Chapters 61–24.3 and 61–24.-4, N.D.C.C., and amended Section 57–51.1–07, N.D.C.C. Chapter 61–24.3 authorizes construction of the Southwest Pipeline project; Chapter 61–24.4 authorizes the issuance of bonds to finance the project; and the amendment to Section 57–51.1–07 provides that ten percent of monies deposited in the oil extraction tax development fund should be allocated to a sinking fund established for payment of the Southwest Pipeline bonds.

Pursuant to this legislation, the Industrial Commission has adopted and approved a "Construction and Operating Agreement" and an "Agreement Regarding: System Revenue Bonds in the Southwest Pipeline Project" to implement the project. These

agreements require the signature of the State Treasurer. The State Treasurer, however, has refused to sign the agreements and has petitioned this court for a determination of the validity of the financing scheme outlined in Chapter 61–24.4. He seeks a declaratory judgment holding the financing scheme unconstitutional and an injunction prohibiting issuance of bonds to finance the project. The respondents, members of the Industrial Commission and the North Dakota State Water Commission, seek a writ of mandamus ordering the State Treasurer to execute the agreements.

Before turning to the merits of this controversy, we must determine whether or not this court has jurisdiction to decide this case. We have recently stated the principles which govern our authority to exercise original jurisdiction in *State ex rel. Wefald v. Meier*, 347 N.W.2d 562, 564 (N.D.1984):

"Article VI, Section 2, of the North Dakota Constitution, gives this court authority to exercise original jurisdiction and to issue remedial writs as may be necessary to properly exercise the court's jurisdiction. The power vested in this court to issue original writs is a discretionary power which may not be invoked as a matter of right, and this court will determine for itself whether or not a particular case is within its original jurisdiction. *State ex rel. Peterson v. Olson*, 307 N.W.2d 528 (N.D.1981). It is well settled that the power of this court to issue writs in the exercise of its original jurisdiction extends only to those cases in which the question presented is *publici juris*, wherein the sovereignty of the State, the franchises or prerogatives of the State, or the liberties of its people are affected. *State ex rel. Link v. Olson*, 286 N.W.2d 262 (N.D.1979). To warrant the exercise of this court's original jurisdiction, the interests of the State must be primary, not incidental, and the public, the community at large, must have an interest or right which may be affected, *State ex rel. Vogel v. Garaas*, 261 N.W.2d 914, 916 (N.D.1978)."

We are also concerned with whether or not the State Treasurer has standing to bring the action. This court has indicated that an elected State official to whom no injury can result and to whom no violation of duty can be imputed by reason of the performance of an act in compliance with the requirements of a statute may not question its constitutionality. See *State v. Baker*, 74 N.D. 244, 21 N.W.2d 355 (1946). A portion of the Syllabus by the Court in *Baker* states:

"Pursuant to the constitution and the statutes of the state of North Dakota, when a state officer is in doubt as to the constitutionality of a statute, under the terms of which he is called upon to perform a ministerial act, it is his duty to consult with and procure the opinion of the attorney general with respect to the matter and be guided in his action by that opinion until it is superseded by judicial decision. If he follows this course he will be protected and absolved from liability under his oath and on his official bond. If he does not request an opinion from the attorney general, or, having done so disregards it, and refuses to perform as required by the statute, he cannot raise the question of its constitutionality as a defense in a mandamus proceeding to compel performance."

Although *Baker* involved a mandamus action brought against the State Auditor in which the Auditor raised the constitutionality of the statute sought to be enforced as a defense, whereas this case involves an action brought by the State Treasurer in which he questions the constitutionality of certain statutes, we do not believe that difference is significant.

■ The holding of this court in *Baker* has not been superseded in the intervening years, and we recently cited *Baker* in *Haugland v. Meier*, 339 N.W.2d 100, 106 n. 6 (N.D.1983). The State Treasurer did not request the opinion of the Attorney General concerning the constitutionality of the

statutes he now challenges,[1] nor does he allege that he has any duties other than ministerial duties with regard to the issuance of the bonds. Rather, he urges that we do not apply the holding in *Baker* because the Attorney General, as a member of the Industrial Commission, is a respondent to the action and it would be a useless act to request his opinion as to the constitutionality of the statutes at issue. Further, the State Treasurer alleges that *Baker* should not apply because he instituted this action not only as State Treasurer but also as a resident and taxpayer of the State of North Dakota. Neither of these reasons persuades us that the holding of *Baker* should not be applied in this instance. There is no reason to believe that because the Attorney General is a member of a board charged with implementing statutes enacted by the Legislature he would be unable to perform his statutory duty to consult with and advise State officers and, "when requested give written opinions on all legal or constitutional questions relating to the duties of such officers ..." as specified in Section 54–12–01(6), N.D.C.C. Nor are we impressed with the argument that the State Treasurer also instituted the action as a resident and taxpayer of the State of North Dakota. Every elected official must be a resident of the State as a qualification of office. See Article V, Section 12, North Dakota Constitution. Presumably most of them are taxpayers as well. If we are to accept jurisdiction of this matter, it will be for reasons other than that the rationale of *Baker* is no longer viable or is not applicable under the facts of this case.

We have no doubt, however, of the significance of this case to the people of the State of North Dakota. It is significant to those who will be served by the Southwest Pipeline, as well as to all taxpayers of the State. It presumably will be significant in the future as a precedent for the Legislature in determining whether or not bond issues for projects the Legislature deems desirable and advisable, and which the Legislature finances with a portion of the tax revenues of the State, are in violation of the limits of indebtedness imposed by our Constitution. The State Treasurer, in his challenge, has raised issues which involve the State debt limitation in our North Dakota Constitution as well as the authority of the Legislature to enact legislation prescribing the use of future tax revenues. The issues raised in this case are *publici juris. State ex rel. Wefald v. Meier, supra.*

Furthermore, we recognize the action for what it is—an action necessary to test the constitutionality of the statutes authorizing the issuance of the bonds in order to determine the marketability of the bonds. We agree with the position taken by the Supreme Court of Montana in *Grossman v. State*, Mont., 682 P.2d 1319, 1326 (1984), wherein that court, in determining whether or not it should accept jurisdiction of an original action brought to test the validity of statutes authorizing bonds, stated:

"We should without hesitancy recognize this case for what it appears to be: a test case designed to obtain a final judgment on the validity of coal severance tax revenue bonds so that if valid, the bonds will be marketable. We will no longer be qualmish about jurisdiction in a bond issuance case. When the issues are fairly stated, fully explored and vigorously contended, as they appear

---

1. The State Treasurer did request the Attorney General to bring the action but the Attorney General refused. Ordinarily, the consent or refusal of the Attorney General to institute the action should be secured in initiating the exercise of original jurisdiction of this court for the reason that the Attorney General is the legal representative of the interests of the State, its sovereignty, franchises, and liberties of the people. See, e.g., *State v. State Board of Canvassers,* 44 N.D. 126, 172 N.W. 80 (1919). However, that consent or refusal is not necessary when the action is one in which the Attorney General is one of the parties defendant, and which concerns his alleged wrongful acts and seeks to restrain them. See, e.g., *State v. Langer,* 46 N.D. 462, 177 N.W. 408 (1919).

here, we have a justiciable controversy suitable for final resolution by this Court. Legal niceties must bend on occasion to the reality of the market. The living law moves with the times."[2]

We do not, however, encourage original filings in this court and this opinion should not be construed as a change in our position on that matter. The district courts are open as the initial forum for many such controversies. Similar challenges have been brought in the district court in the past. See, e.g., *Nord v. Guy*, 141 N.W.2d 395 (N.D.1966), in which an action to challenge the constitutionality of statutes authorizing the issuance of bonds to provide and equip facilities at State-supported institutions of higher education was initiated in the district court by a taxpayer.

■ But, as the Montana court noted in *Grossman, supra,* a district court opinion is not sufficiently authoritative to provide underwriters and investors with a final resolution of the constitutional issues involved. Unless we accept jurisdiction the issuance of the bonds will be delayed if district court proceedings are required and the bonds are found valid. If we do not accept jurisdiction and the bonds are found to be invalid, the process of litigation may well extend into or beyond the 1985 Legislative Session. We agree with the Montana Supreme Court it is "when special circumstances, presenting issues of an urgent or emergency nature, exist requiring speedy determination, that we deem it wise to accept original jurisdiction, and to recognize standing of an ordinary taxpayer for that proceeding." *Grossman, supra,* Mont., 682 P.2d at 1325. Although we have not been advised of the reason that the action challenging the statutes was not filed until June 8, 1984, we note that if we should find constitutional objections which would negate the issuance of the bonds, a decision by us now will allow the 1985 Legislature to consider alternative methods of financing the project. Requiring the action to be litigated initially in district court might preclude the 1985 Legislature from considering such alternatives. We accept jurisdiction.

■ It is a well-established principle that an enactment of the Legislature is conclusively presumed to be constitutional unless it is clearly shown that the legislation contravenes the State or Federal Constitution. *Hall GMC, Inc. v. Crane Carrier Co.*, 332 N.W.2d 54 (N.D.1983); *Patch v. Sebelius*, 320 N.W.2d 511 (N.D.1982); *Paluck v. Board of County Commissioners, Stark County*, 307 N.W.2d 852 (N.D.1981). Because the State Constitution does not confer power on the Legislature, but is a limitation on power, the Legislature "may in the exercise of its power appropriate and expend money for whatever purpose it pleases unless its action violates a limitation found, either expressly or impliedly, in the Constitution." *Verry v. Trenbeath*, 148 N.W.2d 567, 571 (N.D.1967).

The State Treasurer has raised numerous challenges to the constitutionality of the financing scheme for the Southwest Pipeline. We determine that the following issue is dispositive: Would the issuance of bonds pursuant to Chapter 61–24.4 be in violation of the constitutional debt limit established in Article X, Section 13, of the North Dakota Constitution?

Article X, Section 13, provides:

"The state may issue or guarantee the payment of bonds, provided that all bonds in excess of two million dollars shall be secured by first mortgage upon real estate in amounts not to exceed sixty-five percent of its value; or upon real and personal property of state-owned

---

**2.** Although we have cited with approval the Montana Supreme Court in its disposition of the jurisdictional issues in *Grossman,* we do not reach the same conclusion on the merits. Montana has different constitutional provisions than does North Dakota and thus the *Grossman* decision is of little value as precedent on the issue we consider controlling in this instance.

utilities, enterprises, or industries, in amounts not exceeding its value, and provided further, that the state shall not issue or guarantee bonds upon property of state-owned utilities, enterprises, or industries in excess of ten million dollars.

"No further indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes, to be clearly defined. Every law authorizing a bond . issue shall provide for levying an annual tax, or make other provision, sufficient to pay the interest semi-annually, and the principal within thirty years from the date of the issue of such bonds and shall specially appropriate the proceeds of such tax, or of such other provisions to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax or other provisions discontinued until such debt, both principal and interest, shall have been paid. No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war or to provide for the public defense in case of threatened hostilities."

It is conceded by the respondents that the bonds in this case are in excess of $2,000,000, are unsecured, and do not fall within any of the listed exceptions to the debt limitation. They contend, however, that the bonds are not subject to the debt limitation because they are not State "debts" under the special-fund doctrine.

We have long recognized the special-fund doctrine as an exception to the constraints of the constitutional debt limitation. See, e.g., *Marks v. City of Mandan*, 70 N.D. 474, 296 N.W. 39 (1941); *Thomas v. McHugh*, 65 N.D. 149, 256 N.W. 763 (1934); *Lang v. City of Cavalier*, 59 N.D. 75, 228 N.W. 819 (1930). The special-fund doctrine was explained in *Marks v. City of Mandan, supra*, 70 N.D. at 487–488, 296 N.W. at 47:

"From the foregoing cases it may be said that North Dakota has adopted what is generally termed as the 'special fund' doctrine as applied to the obligations incurred by municipalities or the state itself with regard to special assessment funds for paving and sewers, contracts for the purchase of electric light plants and the erection of dormitories at state educational institutions. This doctrine may be stated as an established rule of law. It is that, bonds, warrants, contracts, or other obligations issued or entered into by the state, or its municipalities, when specially authorized by statute, do not come within the meaning of the words 'debt' or 'indebtedness' as used by the debt limitations provisions of the constitution if these obligations are secured by and payable exclusively from revenues to be realized from public property acquired with the proceeds of the obligations or assessments on private property benefited by the special improvements."

We further explained the doctrine in *State ex rel. Syvertson v. Jones*, 74 N.D. 465, 477, 23 N.W.2d 54, 60 (1946):

"There is no question but that in recent years the "special fund doctrine" has been established—that is, the theory that the revenue obtained from some utility or any public improvement is devoted to the debt created by that utility or improvement as the sole source of payment of the indebtedness and thus does not become a public debt of the state within the meaning of the term indebtedness used in consideration of debt limits.... Where a law provides for public utilities or improvements, for a revenue therefrom and that all indebtedness created is payable solely from that revenue and not from state taxation this indebtedness is not taken into consideration in determining the debt limit of the state or municipality."

It was further pointed out in *State ex rel. Syvertson v. Jones, supra,* that the special-fund doctrine, which had previously been raised before this court only in cases involving the municipal debt limitation, was equally applicable to the State debt limitation contained in the Constitution.

Previous cases in which we have applied the special-fund doctrine have involved bonds to be paid from a special fund consisting of revenues from the project to be funded. See *Stark v. City of Jamestown*, 76 N.D. 422, 37 N.W.2d 516 (1949) (improvement and expansion of municipal water plant to be funded by revenues from plant); *Thomas v. McHugh, supra* (municipal electrical power plant to be funded from plant revenues); *Lang v. City of Cavalier, supra*, (municipal electrical plant funded by plant revenues likened to a "special assessment fund"). We have not previously had an opportunity to determine whether the special-fund doctrine applies when the fund is derived from a general excise tax of the State, as in this case.[3] There is language in our early cases, however, which strongly suggests that bonds which are funded by State taxes are State "debts" within the meaning of the debt limitation. For example, in *State ex rel. Board of University and School Lands v. McMillan*, 12 N.D. 280, 304, 96 N.W. 310, 319 (1903), this court stated:

"It requires no argument to show that this is a promise of the state to pay the principal and the interest; and, as we shall hereafter see, it is a promise to pay out of state resources, and a promise which can only be discharged by a resort to taxation.... Without attempting to classify these instruments, it is entirely apparent that they evidence a state debt, every dollar of which, both principal and interest, must inevitably be repaid by a resort to general taxation. The theory is that the interest and income fund will pay these bonds and the interest on them, and that they cast no burden upon the taxpayer. Our answer is that the taxpayer is compelled to pay them."

And, in *State ex rel. Syvertson v. Jones, supra*, 74 N.D. at 477, 23 N.W.2d at 60, we stated that the special-fund doctrine applies when "a law provides for public utilities or improvements, for a revenue therefrom and that all indebtedness created is payable solely from that revenue *and not from state taxation* ..." [Emphasis added.]

The result urged by the respondents would require us to extend the special-fund doctrine well beyond any prior application of the doctrine by this court. Although we have not previously considered the precise issue presented in this case, the parties have cited numerous cases from other jurisdictions in support of their respective po-

**3.** Under the statutory scheme enacted by the 1983 Legislature, the bonds issued to finance the Southwest Pipeline would be paid from a special fund derived from the oil extraction tax. The oil extraction tax was created by an initiated measure of November 4, 1980, and is codified as Chapter 57–51.1, N.D.C.C. Section 57–51.1–02 provides that an excise tax shall be imposed upon the extraction of oil within the State at the rate of six and one-half percent of gross value at the well. Pursuant to Section 57–51.1–07(1), N.D.C.C., as amended in 1983, ten percent of the oil extraction tax is to be allocated to a sinking fund to pay the Southwest Pipeline bonds.

As adopted by the people of the State, the oil extraction tax was to be apportioned as follows: forty-five percent to the state school aid program; forty-five percent to the general fund; and the remaining ten percent to a trust fund, with the first $15,000,000 appropriated to the Grafton State School. After this initial appropriation to the Grafton State School, the principal of the trust fund was to be left to accumulate, with the interest thereon to be appropriated for development of energy conservation and renewable energy sources, development of co-generation systems, and development of waste products utilization. See 1981 N.D.Sess.Laws Ch. 649.

The 1981 Legislature extensively amended the provisions of the initiated measure. In particular, the Legislature changed the terms of the trust fund to allow use of principal and income of the fund for planning and construction of water supply facilities, and appropriated money for preliminary designs for the Southwest Pipeline. See 1981 N.D.Sess.Laws Ch. 613. The Legislature also amended the distribution of the remaining ninety percent of revenues, allocating sixty percent to the state school aid program and thirty percent to the general fund. The 1983 Legislature further amended the trust fund allocation, codified at 57–51.1–07, N.D.C.C., to provide that the funds be allocated to a sinking fund established for payment of the Southwest Pipeline bonds, with any excess credited to a trust fund to finance other water supply facilities and alternative energy sources. The Legislature again revamped distribution of the remaining revenues from the tax, allocating all ninety percent to the general fund. See Section 57–51.1–07, N.D.C.C.

sitions on the constitutionality of bonds, funded by excise taxes, which exceed the debt limit. The cases evidence a wide divergence of opinion.

█ We decline to extend the special-fund doctrine as requested by the respondents, and agree with those jurisdictions which hold that an obligation to be funded from general tax revenues, whether they be ad valorem or excise taxes, is a "debt" within the meaning of the debt limitation provision. Therefore, the special-fund doctrine does not exempt such obligations from the $2,000,000 debt limitation contained in our State Constitution.

We believe that the experiences of the State of Washington point out the potential dangers inherent in extending the special-fund doctrine as urged by the respondents. Prior to 1949, the Supreme Court of Washington had applied the special-fund doctrine in several cases to uphold bonds payable from funds not derived from taxation, but had struck down bonds which were to be financed with State tax dollars. See *State v. Martin,* 62 Wash.2d 645, 384 P.2d 833 (1963), for a discussion of these early cases. In *Gruen v. Tax Commission,* 35 Wash.2d 1, 211 P.2d 651 (1949), over the dissent of four justices, the court vastly extended its application of the doctrine, holding that $80,000,000 in bonds issued to provide bonuses to World War II veterans payable from a special fund derived from an excise tax on cigarettes did not violate Washington's constitutional debt limitation provision.

*Gruen* remained the law of the State of Washington until 1963. During those fourteen years, the Washington Legislature authorized nearly two-thirds of a billion dollars in bonds to fund State construction projects financed primarily by taxes on retail sales, motor vehicles, gasoline, and other motor fuels. *State v. Martin, supra.* Although the court noted that in relation to the State's total revenues the outstanding bonds actually represented a modest commitment, it was the opportunity for uncontrolled proliferation of special-fund bonds which disturbed the court:

"So it seems that, even as the *Gruen* case was filed, the seeds of its possible dissolution were sown. Time became its enemy even though the state government, under stare decisis, was obliged to treat it as a guidepost in the funding of badly-needed projects throughout the state. Thus, a single excise on a lone commodity, limited and precise, placed in a special fund for the redemption of bonus bonds, could understandably appeal to the majority of the judges as not constituting a general obligation of the state and hence not violative of the state's debt limit; but the very logic of the holding authorized preemption of portions of the state's general revenues by each succeeding session of the legislature in the form of segregating future sales tax revenues into special funds. So it is that the reasoning of the minority in *Gruen,* clarified by time and events on the question of debt limitation, now seems more cogent and persuasive." *State v. Martin, supra,* 62 Wash.2d at 651–652, 384 P.2d at 837.

One of the *Gruen* dissenters had accurately predicted such a proliferation in warning the majority to heed the experiences of South Carolina:

"[South Carolina] is finding that the breach in the dike of debt limitation made in the cases cited, where bonds for highway construction were to be paid from motor vehicle fuel taxes pledged for that purpose, is rapidly widening.... South Carolina's subsequent experiences might suggest: 'Stop! Look! Listen!' " *Gruen v. Tax Commission, supra,* 35 Wash.2d at 72–73, 211 P.2d at 690–691 (Hill, J., dissenting).

Other courts have also expressed concern that allowing specific tax revenues to constitute a special fund exempt from constitutional debt limitations would, in effect, nullify the debt limits. For example, in *Morris v. Board of Regents of University of Nevada,* 97 Nev. 112, 115–16, 625 P.2d 562, 564 (1981), the court held that bonds issued to construct buildings at the University of Nevada, to be repaid from the slot

machine tax, violated the constitutional debt limitation:

"Were we to accept the proposition that a pledge of any specific tax revenues would be sufficient to invoke the 'special fund' doctrine, the constitutional debt limitation would be largely nullified, since the legislature could exempt almost any obligation from its strictures merely by identifying a specific tax from which the obligation could be paid."

Similarly, in *State ex rel. Diederichs v. State Highway Commission*, 89 Mont. 205, 211–212, 296 P. 1033, 1035 (1931), the Supreme Court of Montana stated:

"Under this contention the Legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation."

See also *Taxpayers and Citizens of the Town of Georgiana v. Town of Georgiana*, 265 Ala. 654, 93 So.2d 493 (1956); *Richards v. City of Muscatine*, 237 N.W.2d 48 (Iowa 1975); *State ex rel. Ward v. Anderson*, 158 Mont. 279, 491 P.2d 868 (1971); *State ex rel. Meyer v. Steen*, 183 Neb. 297, 160 N.W.2d 164 (1968).

In determining whether or not a special fund may be derived from an excise tax, we are also mindful of the strong public policy considerations which are embodied in the constitutional debt limitation. In *Lang v. City of Cavalier, supra,* our court stated that such constitutional provisions are intended to serve as a limit to taxation and as a protection to taxpayers. The Supreme Court of South Dakota, in *Boe v. Foss,* 76 S.D. 295, 77 N.W.2d 1 (1956), suggested that the debt limitation is intended to shield the taxpayers from the burdens of debt service, foster public credit, and restrain one generation from enjoying benefits at the expense of those to come.

■ We believe that allowing a special-fund exemption for bonds funded from excise taxes would, in effect, nullify the debt limitation and remove the protections which the people of the State of North Dakota reserved unto themselves in Article X, Section 13, of the Constitution. We hold that bonds funded by any general State tax, excise or ad valorem, constitute a "debt" of the State within the meaning of the constitutional debt limitation.

In so holding, we adopt the following statement of the Supreme Court of Washington in *State v. Martin, supra,* 62 Wash.2d at 661, 384 P.2d at 842–843:

"That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales or leases of publicly owned lands, any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. Hence, we must take care that the employment of peripheral doctrines do not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt

of the state. It matters little whether the tax be ad valorem or an excise."

We are not unmindful that there are courts which have arguably reached the result urged by respondents and have upheld special funds which are supported by general tax revenues. See, e.g., *City of Phoenix v. Phoenix Civic Auditorium & Convention Center Association,* 100 Ariz. 101, 412 P.2d 43 (1966); *Switzer v. City of Phoenix,* 86 Ariz. 121, 341 P.2d 427 (1959); *City of Palatka v. State,* 440 So.2d 1271 (Fla.1983); *Miller v. Covington Development Authority,* 539 S.W.2d 1 (Ky.1976); *In re Request for Advisory Opinion,* 400 Mich. 311, 254 N.W.2d 544 (1977); *Mims v. McNair,* 252 S.C. 64, 165 S.E.2d 355 (1969). See also *Moses v. Meier,* 148 Or. 185, 35 P.2d 981 (1934); *but see Terry v. Multnomah County,* 27 Or.App. 15, 554 P.2d 1017 (1976). Some of these decisions may be distinguished on the basis of the particular constitutional provision involved. In addition, some jurisdictions allow the special fund to be financed through any taxes other than ad valorem property taxes. E.g., *City of Palatka v. State, supra; State v. City of Daytona Beach,* 431 So.2d 981 (Fla. 1983); *Mims v. McNair, supra.* Article X, Section 1, of the North Dakota Constitution prohibits the levying of an ad valorem property tax by the State, and therefore our State government must rely upon other revenue sources. If we were to extend the special-fund doctrine as Florida and South Carolina have, *all* State revenues could be used as a source for special funds because none are derived from ad valorem property taxes, and the constitutional debt limitation would be rendered meaningless.

Additional cases could be discussed which hold that tax revenues may not be included within a special fund. E.g., *People ex rel. City of Chicago v. Barrett,* 373 Ill. 393, 26 N.E.2d 478 (1940); *State ex rel. Wyoming Farm Loan Board v. Herschler,* 622 P.2d 1378 (Wyo.1981); *Witzenburger v.*

*State ex rel. Wyoming Community Development Authority,* 575 P.2d 1100 (Wyo. 1978). We have reviewed the authorities on both sides of the issue before us and we are convinced that the reasoning supporting the conclusion we reach today is more persuasive.

We have also considered the respondents' argument that the instant case is distinguishable from the other excise tax cases because the oil extraction tax is a nontraditional tax on a depletable resource. They contend that because the oil extraction tax is less "comprehensive" than the taxes which supported the bonds in the various cases we have followed, a different result is warranted. We see no logical basis for distinguishing the oil extraction tax from any other excise tax applied generally across the State. The Washington experience, with its proliferation of "special fund" projects between 1949 and 1963, is graphic evidence of what happens once the "foot is in the door." A dividing line must be drawn, and we believe it is more clearly drawn by prohibiting *any* tax from being the basis for a special fund, rather than by creating artificial distinctions based upon the "comprehensiveness" of the tax.[4]

The respondents also argue that the holding in *Stark v. City of Jamestown, supra,* is controlling and requires us to uphold the bonds. In *Stark,* the city planned to finance improvements and expansion of its municipal water plant and sewage system by issuing bonds to be paid from the revenues of the plant and system, including revenues from the existing system. We held that the bonds fell within the special-fund exemption to the municipal debt limitation, without requiring that revenues from the existing and new systems be segregated. The respondents contend that we thereby rejected a "restricted" special-fund doctrine, and that the case supports

4. Although it is not controlling, and perhaps not even relevant to the issue before us, we note that in at least three instances in the past the electors approved an amendment to the North Dakota Constitution in order that bonds to pay adjusted compensation to veterans could be issued. See 1971 N.D.Sess.Laws Ch. 616 (Vietnam Conflict); 1957 N.D.Sess.Laws Ch. 396 (Korean Conflict); 1949 N.D.Sess.Laws, p. 510 (World War II).

their theory that funds from any source may be used to repay bonds.

We believe that the distinctions between *Stark* and this case are obvious. In *Stark,* we upheld bonds which were to be financed by *revenues* from an existing facility which was to be improved and expanded with the funds obtained; in this case, the State wishes to issue bonds payable from an oil extraction *tax* which is wholly unrelated to the project being funded. We do not believe that *Stark* is controlling over the instant case, nor is our holding today inconsistent with *Stark.*

The respondents argue that if this court rejects the application of the special-fund doctrine in this case, the legislation nevertheless can be sustained on the theory of a "continuing appropriation." In support of this contention, the respondents rely on this court's decisions in *State v. Sorlie,* 56 N.D. 650, 219 N.W. 105 (1928), and *State v. Moses,* 72 N.D. 142, 5 N.W.2d 303 (1942), and several decisions of courts in other jurisdictions. See *McDonald v. Frohmiller,* 63 Ariz. 479, 163 P.2d 671 (1945); *In re Continuing Appropriations,* 18 Colo. 192, 32 P. 272 (1893); *Jeffreys v. Huston,* 23 Idaho 372, 129 P. 1065 (1913); *Fleckten v. Lamberton,* 69 Minn. 187, 72 N.W. 65 (1897); *Grossman v. State,* Mont., 682 P.2d 1319 (1984); and *Holmes v. Olcott,* 96 Or. 33, 189 P. 202 (1920).

An analysis of these decisions reveals that the "continuing appropriations" approved in most of these cases differ significantly from the legislation at issue in this case. With the exception of *Grossman,* which is distinguishable on the basis of the particular State constitutional provisions involved, each appropriation in the other cases, although "continuing" in a sense, was nevertheless subject to repeal or modification by future legislative assemblies.[5] However, the "continuing appropriation" in this case cannot be repealed once the bonds are issued without threat of a breach of contract action by the bond holders until the bonds and interest are paid in full.

We agree with the rationale of the Colorado Supreme Court in *In re Senate Resolution No. 2, Etc.,* 94 Colo. 101, 115–116, 31 P.2d 325, 331 (1933), in which the court addressed a similar assertion that the "continuing appropriation" theory could serve as an alternative basis to the special-fund doctrine for upholding the challenged legislation:

"It is said that this bill can be sustained on the theory of a 'continuing appropriation' as upheld in *In Re Continuing Appropriations,* 18 Colo. 192, 32 P. 272. But an appropriation made by one General Assembly to pay for services or materials to be thereafter annually furnished, and which 'continues' only because future General Assemblies do not, as well they might, discontinue both consideration and payment, and a 'continuing appropriation' by a so-called 'irrepealable act' to pay in installments, over a long period of years, for services or materials furnished in toto during the current year, are so different in all essential particulars as to have nothing in common save an arbitrary name. If the latter can be upheld under the cloak of continuing appropriations, this constitutional prohibition against contracting debts is construed out of existence, for under that cloak any debt may pass."

We conclude that the "continuing appropriation" theory cannot serve as a subterfuge for evading the State constitutional debt limitation.

In view of our disposition of this case, we deem it unnecessary to address the other arguments raised by the State Treasurer. "Questions, the answers to which are not necessary to determination of the case, need not be considered." *Hospital Services v. Brooks,* 229 N.W.2d 69, 71 (N.D.1975).

For the reasons stated in this opinion, the injunction sought by the State Treasurer prohibiting the issuance of bonds to finance the Southwest Pipeline is granted and the writ of mandamus sought by the

---

**5.** It is unclear whether or not the appropriation in *Fleckten v. Lamberton,* 69 Minn. 187, 72 N.W. 65 (1897), was subject to repeal or modification by ensuing legislatures.

respondents ordering the State Treasurer to execute the agreement is denied.

ERICKSTAD, C.J., and PEDERSON, GIERKE and SAND, JJ., concur.